David 0. Boehm, J.
The defendants have been jointly indicted on the charge of promoting gambling in the first degree, in that on or about October 17, 1971, at the Town of Irondequoit, New York, they engaged in bookmaking and received, or accepted in one day more than five bets totaling more than $5,000. Both were arrested November 5, 1971 upon an arrest warrant signed November 4, 1971.
Several motions have been brought by the defendants seeking diverse relief.
One, a motion to compel the District Attorney to supply the defendants with a transcript of their conversations seized pursuant to an eavesdropping warrant, was previously denied. Their motion for discovery and inspection of the eavesdropping warrant and its supporting papers and the recordings and tapes, including logs and memoranda thereof, of the defendants’ conversations was granted.
It is appropriate to note that such discovery was permitted pursuant to subdivision 3 of CPL 700.50, rather than article 240, as requested. I read section 700.50 as mandating disclosure of any conversations intercepted by a wiretap. To read it otherwise, as permitting disclosure only as a court may from time to time decide is in the interest of justice, would seem to be in direct conflict with the clear requirement of Aldermam v. United States (394 U. S. 165, 184).
In granting such discovery, it was necessary to make the determination that the defendants were aggrieved persons with standing to move under article 710 to suppress the conversations seized and such a finding was made. The wiretap was of the defendants’ telephone and the conversations intercepted and recorded were held through that telephone. Most of the conversations were of the defendants themselves.
The defendants have also brought a motion to suppress based upon multiple grounds. They will be taken in order.
First, is an application to suppress the conversations intercepted pursuant to the eavesdrop order of October 14, 1971 authorizing the wiretap of the defendants’ telephone. It is urged, generally, that the order was defective, issued without *168 probable cause, and was improperly executed. Some of the points raised by the defendants have been resolved by the Court of Appeals decision in People v. Gnozzo (31 N Y 2d 134) decided after the first motion was brought. Nevertheless, there are .still several open questions which are troublesome but which do not require decision here. Although raised, they are not determinative of the application, yet they should be referred to, if only briefly, because of the important issues they raise.
The defendants question the authority in the wiretap order given to the District Attorney to designate the law enforcement agency to execute the wiretap. Such discretion would seem to be in conflict with subdivision 5 of CPL 700.30, and should not be permitted.
The defendants further question the unrestricted authority given in the wiretap order to those executing the wiretap to continue to intercept conversations until the full 30-day period has terminated. "While the statute is clear that a wiretap should not last any longer than is necessary to achieve its objectives, and in no event “ longer than .thirty days” (CPL 700.10, subd. 2), the time during which such wiretap continues must .reasonably relate to the kind of conversations being sought and the crime involved. In this case, where the suspected crime involves extensive gambling activity it does not appear unreasonable to allow the tap to continue the full 30 days. Indeed, the Court of Appeals so indicated in People v. Gnozzo (31 N Y 2d 134, supra).
However, in the future, it might be better practice to use the provision of subdivision 1 of CPL 700.50 which requires periodic progress reports. This would inhibit such 24-hour-a-day, 30-day warrants from turning into the general warrants frowned upon by the Fourth Amendment (see, e.g., United States v. Todaro, CR1970-142, W. D. N. Y. 1971; United States v. Norman Joseph, CR1971-2, W. D. N, Y. 1972; United States v. Appoloney, CR1971-22, W. D. N. Y. 1972).
Defendants also attack the eavesdropping order and a prior • eavesdrop order upon which the instant one is bottomed as not having been issued upon the requisite probable cause. Particular criticism is directed at the conclusory statements in the affidavits and the staleness of the intercepted telephone calls which furnished the only grounds for obtaining the prior wiretap order upon which the instant order is based.
The defendants also seek discovery of the telephone conversations intercepted pursuant to the prior eavesdrop order of *169 ■September 24, 1971 on the ground that this order and the conversations obtained thereby laid the groundwork for the wiretap order of October 14, 1971 which resulted in obtaining the defendants ’ conversations.
The defendants also seek to suppress because of the failure of the District Attorney to personally serve written notice of the issuance of the eavesdropping warrant and the other information required to be included in such notice by subdivision 3 of CPL 700.50 upon “ the person named in the warrant and such other parties to the intercepted communications as the justice may determine in his discretion is in the interest of justice.” No notice was personally served upon either defendant. It was mailed,to defense counsel. Further, such notice was not given pursuant to judicial order but was handled by the District Attorney according to his own discretion. This was clearly error and might have required suppression upon this ground alone, as excellently discussed by Justice Frank J. Kronenberg in People v. Tartt (71 Misc 2d 955; see, also, People v. Holder, 69 Misc 2d 863; contra People v. Di Lorenzo, 69 Misc 2d 645, 652).
• However, it is not necessary to decide upon any of the grounds recited above, since the defendants’ application for a suppression hearing with respect to the conversations intercepted as a result of the eavesdrop warrant of October 14, 1971 was granted. Such hearing has been held and the six police officers of the New York State Police and City of Rochester testified. The seven tapes made of the defendants’ telephone tap were introduced into evidence as were the daily logs made by the police officers.
The testimony at the hearing and the exhibits in evidence make it apparent that the eavesdropping warrant was improperly executed.
The percentage of nonpertinent to pertinent calls recorded is 23.6%. The testimony of the police officers and the exhibits containing a summary of their monitoring notes show that of 5,054 feet of recorded telephone calls recorded, 1,205 feet contained nonpertinent conversations, busy signals, misdialing, no-answers, etc. These were telephone calls from 3 p.m. October 15, 1971 to 1:30 p.m. November 2, 1971.
On the other hand, Detective Joseph Perticone testified, and Exhibit 2 indicates, that the total footage recorded during the period of the wiretap was 4,901 feet, of which 917 feet were of nonpertinent calls. This would reduce the percentage of nonpertinent calls to 18.7%.
*170 However, what is of at least equal, if not (greater, importance, is the amount of footage of eavesdropped telephone conversations which were recorded but unmonitored, that is, when all conversations were recorded indiscriminately because no effort was made to distinguish between pertinent and nonpertinent conversations or no one was in attendance to make the effort.
An examination of the testimony and of the exhibits shows that this practice occurred on more than one occasion.
On October 18, 1971, from 7:45 p.m. to 9:00 p.m., no one monitored the wiretap. One hundred seventy feet were taped during this period, of which 120 feet were of a lengthy, purely personal, nonpertinent conversation.
On October 19, 1971, 142 feet of nonpertinent conversation were taped. One of the conversations ran for 135 feet. There are no times listed for these calls, leading one to the conclusion that they were not monitored. The same day another 149 feet of nonpertinent conversation were taped, of which one ran for 118 feet. Again, there are no times listed for any of the nonpertinent conversations.
One of the State Police officers testified that he jSet the machines at a recording speed of 7% feet per minute. This is the fastest recording speed of the tape recorders, and if we assume that this speed was uniformly used throughout the wiretap, it would mean that the above personal and recorded conversations each ran approximately 15 minutes. On the other hand, if the machine had been set at its slowest speed of 1% feet per minute, the conversations would have lasted approximately one hour.- Another trooper testified that he did not know at what speed the recording machine was set; only that it was the practice to set the machine at the higher speed between calls.
Investigator Hampson of the State Police testified that the monitoring terminated at 1:30 p.m. on November 2, 1971. On November 4, 1971 a warrant was presented to and signed by me and on November 5, 1971, at 12:30 p.m. the defendants were arrested.
Yet, as reel No. 6 discloses, the taping continued from 1:17 p.m. on November 2, 1971 to 10:15 a.m. on November 4, 1971. The total footage recorded, but unmonitored, is 550 feet. But the unm-onitored eavesdropping did not stop there. It continued unabated, as reel No. 7 shows, from 10:15 a.m. of November 4, 1971 to 8:15 p.m. of that day for 318 feet, and then for good measure, continued its automatic and unattended eavesdrop another 716 feet on either the 4th or 6th of November, 1971.
*171 In all, the unmonitored recorded telephone calls coming into and going out of the defendants’ household on November 2, and thereafter, total 1,584 feet.
Nor does this present the entire picture.
On October 17, 1971, a Sunday, commencing at 12:55 p.m., there were 36 conversations recorded for a total of 481 feet. Of this, 392 feet were of nonpertinent calls. One such call ran for 264 feet, another for 50 feet, another for 36 feet. There were, in all, 18 nonpertinent calls. There are no times listed for any one of them, nor is there any notation as to the time the monitoring ended that day. The reason would seem obvious; the calls were not monitored that day. Indeed, if they had been monitored, there would have been no need to record over 50% of the conversations, which consisted of the defendants’ teenage daughter talking to her girl friend.
The same thing happened on October 23, 1971. No time is listed for the beginning of the taping that day; nó time is listed for any of the 12 nonpertinent calls, of which one ran for 92 feet; and no time is listed for the conclusion of the tape. There were a total of 665 feet taped on that day.
Again on October 28, 1971, except for the beginning and ending of the taping, 6:51 p.m. to 8:12 p.m., there are no times listed for the nonpertinent calls that were made during that time period, a total of six feet.
Thus, out of the total footage of 6,638 feet taped (5,054 feet plus 1,584 feet taped after 10:15 a.m. on November 2) it would appear that 3,197 feet, or 48%, were unmonitored.
One of the State troopers testified that it was difficult if not impossible to monitor each of the machines being used in the extensive wiretap operation then being conducted. There were times when he was responsible for three machines. He would concentrate on one machine, transcribing notes as the conversation came in, while the other machines ran unmonitored. Later that evening he would play them back and make his notations at that time.
Sometimes he would have to leave the room to go to the bathroom. Sometimes his attention might be diverted elsewhere. But, for whatever reason, there were numerous occasions when the recording equipment swallowed indiscriminately everything coming into and going out of the defendants’ telephone line.
This was a clear violation of the eavesdropping order and the legislation authorizing it which required that the execution of the eavesdrop ‘ ‘ be conducted in such a way as to minimize *172 the interception of communications not otherwise subject to eavesdropping under this article ” (CPL 700.30, subd. 7).
One of the other police officers testified that his method of minimizing the interception of a nonpertinent conversation was by not “ editing ” it, i.e., by lowering the volume to the point where the conversation was recorded but not heard. However, this procedure permitted reproducing the conversation at a later time simply by making it audible.
The mandate of the law is not carried out by simply lowering the volume on the recording equipment so that the purely personal conversation is not heard at that time. It is the “ interception ” of personal conversations which the law forbids. The law is equally violated by recording without hearing.
What is required is that someone be attending the eavesdropping equipment whenever it eavesdrops. The human and the electronic ear must coexist and cofunction. When the human ear is turned away, the electronic ear must be turned off. There can be no unattended eavesdiop for this, per se, represents a failure to minimize.
In addition, the only way of minimizing the interception of a conversation not subject to eavesdrop is by cutting off that part of the equipment which would otherwise record that con-, versation. If the conversation may not be intercepted, it may not be recorded. It was, is and, hopefully, always will be the intention of the law in the United States that purely private conversations ¡be private. Big Brother is not, in this country, a cherished relative.
Therefore, once the officers involved in an eavesdrop ascertain that a conversation is private, they are obliged to terminate the intercept until that conversation is finished. It is, therefore, the obligation of those in charge of law enforcement to furnish sufficient manpower when a wiretap is being carried out so this requirement can be met at all times. To do otherwise imperils the entire operation.
“ The Government contends that all conversations had to be monitored in order to determine whether or not they were narcotic related. However, the record clearly depicts certain communications that could not possibly involve drugs. * * * These are clear cases where the intercept should have been cut off. However, the intercept was not cut off. The surveilling agents did not even attempt ‘ lip service compliance ’ with the provision of the order and statutory mandate but rather completely disregarded it. The record is devoid of any attempt, no matter how slight, to . nimize the interception of unauthorized calls. •
*173 “ This Court is willing to accept the proposition that it may be reasonable to monitor an entire conversation between two known conspirators even if that conversation .turns out to be innocent. 28 U. S. C. § 2518(5) provides for this by demanding only that there be an attempt to ‘ minimize the interception of communications not otherwise subject to interception * * *. (emphasis added). But there comes a time when an officer should reasonably assume that a particular conversation does not involve drugs. ’ * * * If this Court were to allow the Government agents to indiscriminately intercept every conversation made and to continue monitoring such calls when it becomes clear that they are not related to the ‘ authorized objectives ’ of the wiretap and in violation of the limiting provisions of the order such order would become meaningless verbiage and the protections to the right of privacy outlined in Berger and Katz would be illusory.” (United States v. Scott, 331 F. Supp. 233, 247, 248 [D. C., 1971].)
The motion to suppress the conversations intercepted pursuant to the eavesdropping warrant of October 14, 1971 is granted.