**UNITED STATES of America,**
Appellee,

v.

**Joseph MANFREDI et al., Appellants.**

**Nos. 922 to 926, Dockets 72–2278 to 72–2282.**

United States Court of Appeals, Second Circuit.

Argued May 24, 1973.

Decided Nov. 23, 1973.

Lawrence K. Feitell, New York City, for appellant Manfredi.

Irving Anolik, New York City, for appellants Joseph LaCosa, Frank LaCosa, Schrader and Cassarella.

Lewis E. Alperin, Mount Vernon, N. Y., for appellants Yanni and Colangelo.

Pierre N. Leval, New York City, for appellant Mayo.

John M. Walker, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S.

Atty. for the Southern District of New York, Kenneth R. Feinberg and Richard J. Davis, Asst. U. S. Attys., of counsel), for appellee.

Before KAUFMAN, KILKENNY * and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from convictions arising out of the operation of a large-scale narcotics ring from suburban New York and New Jersey which supplied dealers and distributors in Harlem. Questions are raised both as to the sufficiency of the evidence and as to the reception of evidence obtained from wiretapped and recorded telephone conversations. A number of the questions of law involved were also *sub judice* by another panel of this court in United States v. Bynum, 475 F.2d 832 (2d Cir. 1973). There was in that case a remand to the district court for an evidentiary hearing in respect to legality of the wiretap evidence; a decision in this case was withheld pending that evidentiary hearing and the opinion of the *Bynum* panel after remand, which has now been filed. United States v. Bynum, 485 F.2d 490 (2d Cir. 1973). Some of the questions, particularly with respect to the necessity for "minimization" of the wiretaps and of what that minimization should consist were answered by the court in *Bynum* and in part on the basis thereof we affirm the judgments below.

For treatment of the issues involved here, however, we must recount the evidence specifically and in some detail recount the wiretap evidence, that is to say, the evidence obtained by use of the wiretaps and the way in which the wiretaps were conducted.

## I. THE FACTS

A. *The evidence prior to the wiretaps.* The overall proof of the Government was to the effect that Joseph LaCosa was the most visible member of a family narcotics business[1] involved in distributing millions of dollars' worth of heroin and cocaine in the period between April 1970, and April, 1972. His principal, if not sole, source for the heroin was, according to the Government's case, his uncle who lived in New Jersey, Joseph Manfredi, and one of his principal assistants was his cousin, the late Philip J. Manfredi. Other family members also convicted include his father, Frank LaCosa, and his cousin Timothy Schrader. All of these defendants and Vincent Yanni, Charles Cassarella and Robert Mayo, all of whom were distributors or dealers who purchased from the LaCosa-Manfredi family, and Anthony Colangelo, a supplier of cocaine, were convicted below on Count I of an indictment alleging a conspiracy to distribute narcotics in violation of 26 U.S.C. §§ 4705(a) and 7237(b) and 21 U.S.C. § 846. Joseph LaCosa was charged under Count II of the indictment with, and convicted of, "engages in a continuing criminal enterprise" involving narcotics in violation of 21 U.S.C. § 848 and under Count III with distribution of heroin in violation of 21 U.S.C. § 841.[2]

* Of the Ninth Circuit Court of Appeals, sitting by designation.

1. Joseph LaCosa, his wife, Madelyn, and his parents, Frank LaCosa and Mary Manfredi LaCosa, lived at 11 Daisey Court, Nanuet, New York. Philip J. Manfredi, now deceased, his sister, Josephine Manfredi Schrader, and her husband, Timothy Schrader, lived at 10 Sable Court, West Nyack, New York. Joseph's mother, Mary, is the sister of Joseph Manfredi whose home was 115 Kipp Avenue, Lodi, New Jersey. Philip J. Manfredi's second sister, Dianne, is married to appellant Charles Cassarella, and their home is 2262 33rd Street, Astoria, Queens. Josephine Schrader, Dianne Cassarella and Philip J. Manfredi were the children of Urbano Manfredi, a deceased brother of Joseph Manfredi and Mary LaCosa. From time to time, the evidence discloses, Joseph Manfredi drove a 1970 Thunderbird registered to Frank LaCosa but at Joseph Manfredi's New Jersey address, while Joseph LaCosa and/or Philip J. Manfredi often drove two Cadillacs registered to Timothy Schrader.

2. There were 13 other original defendants. Of these, three—Horace Marble, William Marble and Thaddeus Byrd—were severed prior to trial, pleaded guilty, and testified

The Manfredi-LaCosa narcotics organization numbered among its customers Horace and William Marble, Herman Grant, Robert Roseboro, Thaddeus Byrd, and Garland Currie (now deceased), in addition to the other convicted defendants. Horace Marble, who was in partnership with Herman Grant in the heroin traffic in Harlem, met Joseph LaCosa, under the name "Joey," on April 10, 1970. Commencing with the purchase of one ounce of heroin on the following day, another ounce three days later, and then one-eighth of a kilogram, Horace Marble became a regular purchaser from Joseph LaCosa who, sometimes accompanied by Philip J. Manfredi, personally delivered the heroin to Marble until October of 1971 when Marble was arrested. Marble alone purchased between one and two kilograms of heroin per week at prices of $23,500 for one kilogram and $46,000 for two kilograms from the summer of 1970 to October of 1971. Most of the deliveries took place at Third Avenue and 76th or 86th Street in New York after a telephone call from LaCosa to Marble, with payment being made for the preceding shipment each time. William Marble, who was involved in his brother's distribution organization, sometimes received the telephone calls from LaCosa and relayed messages to his brother or occasionally himself picked up heroin from LaCosa or Philip J. Manfredi, including some smaller amounts for his own use. While it is nothing new perhaps to the avid readers of Second Circuit opinions, it might be mentioned that a purchaser such as Horace Marble with his 20-person heroin milling and distribution organization was engaged in an operation so widespread that each of the 17 or so sellers in the group supplied about 50 addicts with heroin. Each kilogram of heroin purchased from LaCosa produced about 600 "bundles," each bundle consisting of 25 "bags," the "bags" in turn each selling for five dollars on the street, so that the street value of each kilogram was about $75,000. Joseph LaCosa, who was not one to hide his light under the proverbial basket, identified his heroin connection to Horace Marble as his uncle, who LaCosa said was "big and in organized crime," adding that his uncle picked up the heroin from the trunk of a car in New Jersey. LaCosa also told Horace Marble that he had another customer in the District of Columbia who purchased four kilograms of heroin per week, so that Marble was only his second biggest customer. Marble once totaled the bills he received from LaCosa for heroin delivered to him as close to one million dollars.

In the latter part of 1970 Joseph LaCosa, who apparently had access to more narcotics than Horace Marble and his Washington, D. C., customer could buy, asked Horace to locate additional dealers for him. Marble introduced him to Robert Roseboro, who testified for the Government. Roseboro had his own heroin milling operation and purchased half-kilogram packages on a bi-weekly basis with deliveries made at the Gracie Square Hospital where Roseboro was on methadone maintenance. On December 15, 1970, Roseboro delivered a half-kilogram of heroin obtained from LaCosa to Agent White of the Bureau of Narcotics and Dangerous Drugs (BNDD) and was then arrested and agreed to cooperate with the Government. After his arrest

---

for the Government against the appellants here. Three others were severed on the Government's motion. Five others could not be arrested. Philip J. Manfredi was murdered prior to trial. Herman Grant was convicted with appellants, but murdered following the filing of his notice of appeal. Joseph Manfredi was sentenced as a second narcotics offender to 30 years' imprisonment and a $25,000 commuted fine. Joseph LaCosa was sentenced to 15 years' imprison-

ment on Counts I and III and 30 years' imprisonment on Count II with the prison terms to run concurrently and a $100,000 commuted fine. Frank LaCosa was sentenced to 10 years' imprisonment and a $15,000 fine, Vincent Yanni to eight years' imprisonment, Charles Cassarella to six years' imprisonment, Anthony Colangelo to 10 years' imprisonment, Robert Mayo to nine years' imprisonment, and Timothy Schrader to seven years' imprisonment.

he met LaCosa while under surveillance and at these meetings LaCosa bragged about his new Cadillac and his new swimming pool and agreed to meet a "customer" from Detroit. Roseboro in turn agreed to pay LaCosa $3,000 which he owed him at his (Roseboro's) apartment. At the apartment LaCosa told Roseboro that his own uncle was his boss and that his uncle's name was "Joe." The purchaser from Detroit, who was a Government agent, put $12,700 in the glove compartment of a rented car and, with Roseboro, met LaCosa at Second Avenue and 70th Street. LaCosa took the car to First Avenue and 84th Street where he abandoned it and joined Philip J. Manfredi in a Cadillac registered to Timothy Schrader. As the Cadillac moved uptown, LaCosa was observed showing a quantity of money to the driver but LaCosa did not return with the heroin as planned. He later told Horace Marble that he believed (quite correctly) that he was being followed by the police. Through Marble, the half-kilogram of heroin was delivered by LaCosa to the Government agent.

Moving to the spring of 1971, Thaddeus Byrd, a gas station attendant, was a drug courier for and in the gypsy taxi business with one Garland Currie, a narcotics dealer and another one of Joseph LaCosa's customers. Byrd, with Currie, met LaCosa, identified as "Duke," and subsequently picked up heroin from and delivered money to him on Currie's behalf, generally at 80th Street and Lexington Avenue. LaCosa instructed Byrd to use the code word "shirt" for heroin in telephone conversations—just as he had done in transactions with Roseboro. Byrd discussed narcotics over the telephone with LaCosa and, working for

Currie, often bought up to two kilograms of heroin in a series of purchases. Byrd was stopped on October 17, 1971, by Agent White of the BNDD after he had delivered money to LaCosa for Currie. Currie died before Byrd saw him again, but Currie's partner, Fred Powell, continued in the business, with Byrd purchasing narcotics twice more from LaCosa.

B. *The wiretap evidence and accompanying surveillance.* On the basis of affidavits by the Rockland County District Attorney, Robert Meehan, State Investigator John Crodelle, and BNDD Agent Frank White, telephonic interception was requested on a 24-hour-a-day basis at the LaCosa home at 11 Daisey Court, Nanuet, New York, and the Manfredi-Schrader home at 10 Sable Court, West Nyack, New York.[3] The affidavit of Crodelle specifically stated: "Your deponent recognized that not all the conversations occurring over the subject telephones will pertain to the said narcotics violations, and accordingly your deponent agrees to limit the seizure of conversations to those specifically pertaining to the aforementioned Penal Law violations." Justice Sweeney of the New York State Supreme Court issued warrants commencing on September 17, 1971, for wiretaps on both phones permitting law enforcement authorities "to intercept, eavesdrop, listen to and make copies of conversations . . . concerning penal law violations pertaining to the crimes of criminally selling a dangerous drug in the first degree, criminal possession of a dangerous drug in the first degree, and conspiracy to commit violation of the aforesaid sections of law." There was an extension of these orders to November 14, 1971.[4] Surveil-

---

3. The telephone at 11 Daisey Court was listed in the name of Frank LaCosa and at 10 Sable Court in the name of Timothy Schrader.

4. This extension was obtained under the provisions of N.Y.C.P.L. § 700.40, McKinney's Consol.Laws, c. 11A (McKinney 1971) [hereinafter cited as CPL].

The original order permitting interception ran for 30 days beginning September 17 but was extended for 30 more days on October 15, 1971, upon the renewal affidavit of Investigator Crodelle and the renewal application of District Attorney Meehan. On November 23, 1971, Justice Sweeney ordered the postponement of notice to the owners of the two instruments

lance was continuous with monitoring agents of the BNDD taking eight-hour shifts, the only exception being when the Daisey Court LaCosa instrument was out of order between September 30, 1971, and October 20, 1971. During this period every conversation was listened to and recorded. Brief notes on the content of the conversations were made in log books maintained by the monitoring agents. Transcription summaries of conversations were then prepared from the tapes; calls thought to be "non-pertinent" were described only briefly in these transcript summaries. Calls thought by the transcribing agents to be pertinent—some shrouded in the code language recounted above and below—were more fully summarized in the transcript sheets. Verbatim transcriptions were prepared of conversations which were obviously pertinent to the case under investigation.

Twenty-seven conversations were offered in evidence and 24 were admitted.[5] Shortly after installation of the interception device at 11 Daisey Court on September 17, 1971, at 5:03 p. m., appellant Cassarella ordered double what he got "the last time" from Joseph LaCosa with delivery to be that night. Seven minutes later "Benny" spoke with Frank LaCosa and arranged for a delivery the following week, Frank assuring him that, if he got the money on one day, the "stuff" would be available the next day, or "if it's early enough you can have it the same night. . . . ." Three days later at 9:35 a. m. "Vinnie" called Philip J. Manfredi at 10 Sable Court, and at 3:27 p. m. ordered "two shirts" from Philip which the latter agreed to deliver at 7:00 p. m. After a further conversation at 5:20 p. m. between Vinnie's man "Alex" and Philip J. Manfredi it was agreed that delivery would be at the

and the sealing of the intercepted recordings after receiving returns as to both instruments from District Attorney Meehan.

Meehan notified both Frank LaCosa and Timothy Schrader of interceptions on May 31, 1972.

5. For trial purposes, the Government selected 27 conversations intercepted from the instruments at 11 Daisey Court and 10 Sable Court. Of these, 24 were admitted into evidence at the trial, which are listed below. All of the conversations in evidence except two were intercepted in the period September 17, 1971, to October 5, 1971.

| No. | Date | Time | Instrument | Participants |
|---|---|---|---|---|
| 1 | 9/17 | 5:03 p.m. | Daisey Ct. | Cassarella/J. LaCosa |
| 2 | 9/17 | 5:10 p.m. | Daisey Ct. | F. LaCosa/"Benny" |
| 3 | 9/20 | 9:35 a.m. | Sable Ct. | Vinnie/Philip Manfredi |
| 6 | 9/20 | 3:27 p.m. | Sable Ct. | Vinnie/Philip Manfredi |
| 7 | 9/20 | 3:34 p.m. | Sable Ct. | J. LaCosa/unidentified male |
| 8 | 9/20 | 5:20 p.m. | Sable Ct. | Vinnie/Philip Manfredi |
| 9 | 9/20 | 5:30 p.m. | Daisey Ct. | J. LaCosa/Mrs. Marble |
| 10 | 9/20 | 7:45 p.m. 9:40 p.m. | Sable Ct. | "Roe"/Josephine Schrader |
| 11 | 9/21 | 11:15 a.m. | Daisey Ct. | Timothy Schrader |
| 13 | 9/23 | 7:47 p.m. | Daisey Ct. | "Frankie"/J. LaCosa |
| 14 | 9/24 | 8:00 p.m. | Daisey Ct. | Yanni/J. LaCosa |
| 15 | 9/26 | 2:38 p.m. | Daisey Ct. | J. LaCosa/T. Byrd |
| 16 | 9/26 | 8:10 p.m. | Daisey Ct. | Yanni/J. LaCosa |
| 17 | 9/27 | 4:55 p.m. | Daisey Ct. | J. LaCosa/"Butch" |
| 18 | 9/27 | 6:52 p.m. | Daisey Ct. | J. LaCosa/Wm. Marble |
| 19 | 9/28 | 6:55 p.m. | Daisey Ct. | Yanni/J. LaCosa |
| 20 | 9/28 | 8:00 p.m. | Daisey Ct. | Unidentified male/J. LaCosa |
| 21 | 9/28 | 8:20 p.m. | Daisey Ct. | Yanni/J. LaCosa |
| 22 | 9/28 | 2:55 p.m. | Daisey Ct. | J. LaCosa/T. Byrd |
| 23 | 9/29 | 2:56 p.m. | Daisey Ct. | J. LaCosa/T. Byrd |
| 24 | 9/29 | 6:10 p.m. | Sable Ct. | J. LaCosa/Wm. Marble |
| 25 | 9/29 | 9:35 p.m. | Daisey Ct. | Yanni/J. LaCosa |
| 26 | 10/28 | 8:25 p.m. | Sable Ct. | Cassarella/Philip Manfredi |
| 27 | 11/ 6 | 5:40 p.m. | Sable Ct. | "Tony Cole"/J. LaCosa |

"frankfurter place" on Third Avenue and 86th Street where the Marble deliveries were generally made. Following that call, Agent White observed Philip J. Manfredi leave 10 Sable Court at 6:10 p. m., enter the Schrader Cadillac and drive to Third Avenue and 86th Street in Manhattan where at 7:10 p. m. he got out of the car. Shortly after that he was arrested. Later that evening Philip's sister, Josephine, discussed the arrest over the telephone at 10 Sable Court with "Roe," stating that Philip had a "quarter" on him and advising "Roe" to "clean up" her house. Following Philip J. Manfredi's arraignment on September 21, Timothy Schrader phoned from the courthouse to Joseph LaCosa at 11 Daisey Court and instructed him to "take the money and put it in a suitcase" and to take "the guns" to his aunt's house "to be safe." On September 23, 1971, at 7:47 p. m., "Frankie" called Joseph LaCosa at 11 Daisey Court and after some preliminary conversation pertaining plainly to Philip's arrest three days before asked him if he had seen his "friend" the other night, by which it may be inferred he meant his connection for narcotics. LaCosa replied that his friend had told him to "go over there tomorrow afternoon." Frankie told him to "let me know . . . . [C]ause ah desperation sitting here." LaCosa did in fact go to his uncle's house the following day, September 24, 1971, and left it at 6:00 p. m. whereupon he drove back to 11 Daisey Court, Nanuet, his own house. There, at 8:00 p. m. on the evening of the 24th, he received a phone call from appellant "Butch" Yanni who, again after some preliminary talk about Philip's arrest, asked him "if we can do anything." LaCosa replied that he "missed the guy tonight" and that he "just missed him by five minutes." Yanni indicated that he might go to "the guy in the Bronx" (another supplier) but that he didn't want any "hard feelings" on LaCosa's part. Two days later at 8:10 p. m. Yanni again telephoned Joseph LaCosa to find out "what's happening?" and was told to

wait until "tomorrow" when he would be seeing "him" (his connection) at "two or three o'clock in the afternoon." The next day, September 27, 1971, Joseph LaCosa left 11 Daisey Court at 1:15 p. m. and drove to Joseph Manfredi's house at 115 Kipp Avenue, where he arrived 45 minutes later. The surveillance agent, White, passed the house and saw Joseph Manfredi standing in the driveway. White then followed LaCosa toward the New Jersey side of the George Washington Bridge, whereupon LaCosa, going 85 to 100 miles per hour, lost the agent, who was only doing 75 to 80. The agent, however, went to LaCosa's residence at 11 Daisey Court and saw him drive a 1971 Cadillac back into his garage at 4:30 p. m. Twenty-five minutes later Joseph LaCosa telephoned Yanni and scheduled a meeting for 11:00 p. m. that night. He later telephoned William Marble also to arrange a meeting and shortly after midnight that night the surveilling agents observed a series of half a dozen cars, including the proverbial late-model Cadillacs and Lincolns, enter the LaCosa garage at 11 Daisey Court at ten-minute intervals, each car staying in the garage for five minutes or so and then leaving the area. A jury might assume that they were not arriving for purposes of oil changes or motor repairs.

On September 28, 1971, the following day, at 6:55 p. m. Yanni called Joseph LaCosa and confirmed a meeting at 9:00 p. m. that night and asked if he could get an "extra shirt or two" to which Joseph LaCosa replied, "By tomorrow." At 8:00 p. m. Joseph LaCosa received a call from an unidentified male telling him to wait "if I am a little late." At 8:20 p. m. Yanni called and asked "how long it will be before you get another shirt down." LaCosa replied "the next day or even tomorrow night," whereupon Yanni explained " 'Cause he asked me for four more." They agreed to meet the following night. On September 29 at 9:35 p. m. Yanni telephoned Joseph LaCosa to tell him that he was waiting for "that guy" and invited LaCosa to

drop by late that night for the money. LaCosa agreed to meet Yanni the following day and said that "the four shirts" were definite. In the light of the non-wiretap testimony from the Marbles, Byrd and Roseboro, a jury might have assumed that these calls did not have to do with men's furnishings.

Earlier on September 29, LaCosa had called Thaddeus Byrd setting up a meeting for that night and complaining that Byrd's last payment of $20,000 was short by $1,000; LaCosa also called William Marble asking for Horace Marble and arranging for a pickup of $1,300 that night from William.

On September 30, 1971, Agent White followed Joseph LaCosa to Yanni's house in New City, New York, where he arrived at 12:30 a. m., that is, later the night of the 29th; photographs in evidence showed LaCosa entering and leaving the house.

At 8:00 p. m. on October 28, Agent White observed Charles Cassarella enter his residence in Queens. Twenty-five minutes later Cassarella called Philip J. Manfredi at 10 Sable Court to ask Phillip whether LaCosa would "do that thing for me or not," complaining that "these guys keep bothering me every day." Phillip's reply was "Don't worry, we'll let you know, all right?"

On November 6, 1971, at 5:40 p. m. Joseph LaCosa placed a telephone call to appellant Anthony Colangelo. Colangelo insisted on a meeting at 7:45 p. m. that evening to deliver a "pair of pants" which is a commonly used narcotics code word for cocaine. LaCosa agreed and Colangelo told him to bring the price of one pair of pants.

C. *Additional evidence.* On March 14, 1972, searches were conducted pursuant to warrants at the LaCosa home at 11 Daisey Court, the Manfredi-Schrader home at 10 Sable Court, and the Yanni home at New City, New York. Much additional evidence was obtained. This evidence included slips of paper bearing references to the defendants on trial and substantial numerical figures identified by Horace Marble as similar to bills of account he received from Joseph LaCosa; an address book bearing names and telephone numbers of the conspirators Grant, Marble, Mayo and Byrd at the home of the Schraders; $39,764 in cash in Timothy Schrader's bedroom; and other miscellaneous items. Three days later, with the use of the address book, Agent Siegel called various telephone numbers found in it. One was that of Herman Grant with whom Siegel as "Joey LaCosa's cousin Dominick" arranged to deliver a "couple of shirts." In return for the "shirts" he received $18,000, following which Grant was arrested. Agent Siegel also called Anthony Colangelo with the use of the LaCosa address book with the same story. Colangelo asked the price, to which Siegel replied $12,000. Colangelo said he wasn't sure and didn't know whether he would take them. At that point a telephone next to Siegel rang loudly in the BNDD headquarters. Colangelo stated that he didn't know anyone by the name of Joey LaCosa and that Siegel must have the wrong party and hung up. Siegel also called Robert Mayo with the same story. Mayo "agreed to take them," that is to say, the shirts, and Mayo said he didn't owe LaCosa any money and that they should meet at the "usual place" which he defined as 126th Street and Fifth Avenue. Mayo did not show up, so Siegel telephoned him again and Mayo subsequently said he couldn't handle the shirts.

On April 30, 1972, Agent White arrested Joseph Manfredi and, after proper warnings, on the way to New York Manfredi stated to White that he thought that the Bureau of Narcotics was going to place him under arrest at the time that Philip J. Manfredi had been arrested in September, 1971. In addition a summary of telephone records was stipulated into evidence which indicated among other things that in the first four months of 1971 there were 64 calls from the Daisey Court telephone to a telephone in the name of Diane Marble, that is to say, her husband, Horace,

and in 11 days' time in August and September of 1971, 12 calls from that number to Robert Mayo, four calls from the Nanuet number to Tony Colangelo between November 8, 1971, and November 11, 1971, and 40 calls from Anthony Colangelo to the Nanuet number between October 29, 1971, and November 8, 1971.

## II.   SUFFICIENCY OF THE EVIDENCE

A.   *Joseph LaCosa.*   There was ample evidence in the testimony of Horace and William Marble, Robert Roseboro and Thaddeus Byrd, independent of the wiretaps, to show that Joseph LaCosa was selling heroin and cocaine in a continuing series of weekly transactions with several distributors, the primary product pushed being heroin.   To Horace Marble alone he sold an estimated one million dollars' worth in 17 months.

B.   *Joseph Manfredi.*   There was sufficient circumstantial evidence independent of hearsay declarations from which Manfredi's participation in the conspiracy could be inferred.   In United States v. Calabro, 449 F.2d 885, 889–890 (2d Cir. 1971), cert. denied, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972), presence of the defendant with a codefendant when the codefendant was engaged in a criminal enterprise, coupled with the defendant's "patting down" an undercover agent, was held to be sufficient independent evidence to permit an inference of the defendant's having associated himself with the criminal venture. *See also* United States v. Geaney, 417 F.2d 1116, 1120–1121 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).   This independent evidence may be completely circumstantial.   *Cf.* United States v. Cassino, 467 F.2d 610, 618 n.21 (2d Cir. 1972), cert. denied, 410 U.S. 928, 93 S. Ct. 1363, 35 L.Ed.2d 590 (1973).   By actual surveillance Joseph LaCosa was seen to try to meet his uncle at the times he told his customers he was going to meet his "friend."   After he did meet his uncle on one occasion he eluded Agent White on the return to his home and that same night there was a series of visits to his garage that can fairly be described as clandestine.   The calls by Joseph LaCosa to his distrubors do not implicate Manfredi as such, but they do shed light on LaCosa's conduct which in turn is circumstantial proof that Manfredi was supplying him with heroin.   *See* United States v. Ruiz, 477 F.2d 918 (2d Cir. 1973) ; United States v. Pacelli, 470 F.2d 67, 69–70 (2d Cir. 1972), cert. denied, 410 U.S. 983, 93 S. Ct. 1501, 36 L.Ed.2d 178 (1973) ; United States v. Calabro, *supra.*   There was, then, sufficient independent evidence to establish Manfredi's participation in the conspiracy to warrant introduction of hearsay statements against him.   Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942).   These statements by Joseph LaCosa to Horace Marble and Robert Roseboro, recounted in the recital of facts above, established Manfredi as the supplier of heroin to LaCosa, thereby confirming the circumstantial evidence related above.   They were made in the furtherance of the conspiracy, since LaCosa was obviously trying to impress his customers with the importance, connections, wealth and power of his uncle in order to build sound "customer relations."   They have a ring of reliability for this very reason. There is no requirement that the trial judge must find, before admitting a coconspirator's declaration, that it is neither "crucial" to the Government's case nor "devastating" to the defense.   United States v. Puco, 476 F.2d 1099, on petition for rehearing, 476 F.2d 1106, 1107 (2d Cir. 1973).   Even if there were such a requirement, the hearsay declarations here were neither more "crucial" nor more "devastating" than the declarations in *Puco* itself.   United States v. Puco, 476 F.2d at 1103–1105.

C.   *Frank LaCosa, Timothy Schrader, Charles Cassarella and Robert Mayo.* Appellants Yanni and Colangelo do not contest the sufficiency of the evidence against them.   Frank LaCosa's house was used for the operation of the narcotics business, his garage was used as a

delivery point, his Lincoln was used by his son Joseph for deliveries; more importantly perhaps his telephone conversation with "Benny" on September 17, 1971, implicates him clearly—he could deliver the "stuff" the day following receipt of the money or if it's early enough in the day "you can have it the same night . . . this way they don't think that they're getting cheated." Schrader's house, telephone and cars were used by Joseph LaCosa and Philip J. Manfredi to arrange narcotics transactions and handle deliveries; his telephone call from the courthouse and treasure trove of nearly $40,000 in cash permit the inference of participation and reward in the conspiracy. Cassarella's calls were more guarded, perhaps, even than the others, but were in "narcotics code," requesting "double" what he got "the last time," inquiring whether Joey was "going to do that for me or not," and in an obvious reference to his own customers, complaining that "these guys keep bothering me every day." Robert Mayo, who was in Joseph LaCosa's address book, was a customer of the ring; Mayo was willing to do business with Agent Siegel masquerading on the telephone as "Joey's cousin Dominick," the business being the taking of "a couple of shirts" and at the "usual place"; that he had done a considerable amount of business was indicated by the numerous calls from 11 Daisey Court to Mayo at the end of August, 1971.

## III. THE WIRETAP QUESTIONS

We omit reference to the question of constitutionality of the federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, since United States v. Tortorello, 480 F. 2d 764 (2d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973), and United States v. Bynum, *supra,* 485 F.2d at 499–500, have dealt with that issue adversely to appellants, noting that the very issue is before the Supreme Court in United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), cert. granted, 411 U.S. 905, 93 S.Ct. 1530, 36 L.Ed.2d 194 (1973).

The principal attacks made on the wiretapping here are (1) an omission in both the original and renewal warrant orders to require "minimization" under state law, CPL § 700.30, and (2) an alleged failure to minimize the interception of innocent conversation on the two telephones tapped, contrary to state law, CPL § 700.30, and federal law, 18 U.S.C. § 2518(5).[6]

6. Under § 700.30 of the CPL, the warrant must contain:
   1. The name of the applicant, date of issuance, and the subscription and title of the issuing justice; and
   2. The identity of the person, if known whose communications are to be intercepted; and
   3. The nature and location of the communications facilities as to which, or the place where, authority to intercept is granted; and
   4. A particular description of the type of communications sought to be intercepted, and a statement of the particular designated offense to which it relates; and
   5. The identity of the law enforcement agency authorized to intercept the communications; and
   6. The period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained; and

7. A provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to eavesdropping under this article, and must terminate upon attainment of the authorized objective, or in any event in thirty days; and
   8. An express authorization to make secret entry upon a private place or premises to install an eavesdropping device, if such entry is necessary to execute the warrant.

18 U.S.C. § 2518(5) reads in pertinent part as follows:
   (5) No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this

**598**

■■ In dealing with the question of the validity of the warrants themselves, clearly a question of state law,[7] it will be recalled that the Crodelle affidavit submitted to the state court judge in support of the petition seeking the wiretap order contained an agreement "to limit the seizure of conversations to those specifically pertaining to the aforementioned Penal Law violations."

■ Neither the original nor renewal warrant orders, however, contained any directive to this effect. CPL § 700.30 specifically says that "An eavesdropping warrant must contain: . . . 7. A provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to eavesdropping under this article. . . ." New York state judges have construed this requirement in different ways, Justice McGrover in People v. Solomon, 74 Misc.2d 926, 346 N.Y.S.2d 938, 941 (Sup.Ct.1973), holding that omission of that specific directive was "nothing more than a 'de minimis' oversight," which would not vitiate an eavesdropping order, while Judge Werken in People v. Kennedy, 75 Misc.2d 10, 347 N.Y.S.2d 327 (Greene Cty.Ct. 1973), held a wiretap order fatally defective for failure to comply with the 700.30 requirement. *Compare* People v. Sher, 68 Misc.2d 917, 329 N.Y.S.2d 2 (Greene Cty.Ct. 1972), *with* People v. Heuston, 42 A.D.2d 860, 347 N.Y.S.2d 78 (1973) (3–2 decision) (re notice), *and* People v. Palozzi, 74 Misc.2d 774, 346 N.Y.S.2d 595 (Monroe Cty.Ct. 1973). No New

York case, however, involves reliance in the order upon supporting *affidavits* which contain an agreement to "minimize." In this case we feel free to analogize from United States v. Tortorello, 480 F.2d at 781, which, while it apparently did not consider the matter as controlled by state law, held that a New York state judge's authorization order was sufficient to establish probable cause on the basis of facts alleged in the supporting affidavits. We feel it proper to read both the orders themselves and the minimization language of the supporting affidavits in "a commonsense and realistic fashion." *See* United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (probable cause); United States v. Desist, 384 F.2d 889 (2d Cir. 1967), aff'd, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969). We read CPL 700.30(7) also as a summation of the more specific requirements of 700.30 subd. 1–700.30 subd. 6, all of which lead to "minimization." So reading the state statute and the orders and affidavits, we do not find the orders vitiated by virtue of omission of the talismanic minimization language.

■■ We turn now to the more difficult question whether, in this case, the eavesdropping was conducted so "as to minimize the interception of communications not otherwise subject to eavesdropping" under CPL § 700.30 subd. 7. This question is, like that of the facial validity of the warrant, one to be determined by reference to state law. Assessment of the minimization question necessarily

---

section and the court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter. . . .

**7.** While we encourage cooperation between federal and state law enforcement agencies, we note that the Government, in allowing a joint investigation to proceed through the use of a state warrant, subjects itself to the risk that state courts may impose on such warrants and the evidence obtained under those warrants a higher standard than would a federal court dealing with interpretation of the federal wiretap statutes. *Cf.* California v. Jones, 30 Cal.App.3d 852, 106 Cal.Rptr. 749, appeal dismissed (1973).

ultimately depends upon the facts and circumstances of each case.

As previously stated, *see* text following note 4 *supra,* all calls incoming or outgoing over the two telephones involved were monitored and recorded irrespective of the identity of the parties engaged in the conversations. After the transcription of the conversations was accomplished in either summary or verbatim fashion, the tapes themselves were kept under lock and key. The court has examined both the monitor logs and the transcription sheets with some care in order to appreciate more fully the claims made by both the defendants and the Government with respect to minimization.

Our examination of state court decisions construing and applying CPL § 700.30 subd. 7 leads us to conclude that none of them is either dispositive or particularly indicative of how the New York courts would rule on the facts before us. The New York Court of Appeals has yet to consider this question. In People v. Holder, 69 Misc.2d 863, 331 N.Y.S.2d 557 at 569–571, the two defendants were under indictment for conspiracy to cause the felonious death of a third party. In that quite simple conspiracy, the fact that fewer than 10 per cent of the conversations recorded were relevant to the conspiracy appears to have been determinative of the court's decision to suppress. In People v. Castania, 73 Misc.2d 166, 340 N.Y.S.2d 829, 833–836 (Monroe Cty.Ct. 1973), the court was faced with a gambling conspiracy more complex than the conspiracy in *Holder* but which cannot be equated with the conspiracy before this court. In *Castania* the court took account of the fact that only slightly over one-half of the conversations had been monitored, which, coupled with the court's assumption that non-pertinent calls could have been recognized as such and not intercepted, dictated a finding that minimization had not been achieved. It is precisely that assumption made by the *Castania* court which cannot be made in this case. In People v. Kenne-

dy, defendants were under indictment for *possession* of dangerous drugs and associated paraphernalia. The court, in dicta, indicated its disapproval of a practice under which only 10 per cent of the calls recorded were actually monitored, thereby virtually negating the possibility of minimizing the interception of calls.

■ These state cases, since they do not deal with complex, far-flung narcotics conspiracies, are not dispositive of the case before us. We feel free, in these circumstances, to consider the question of minimization under the language of 18 U.S.C. § 2518(5) and decisions thereunder, noting that the language of CPL § 700.30 subd. 7 virtually tracks that of the federal statute. We also note that in considering the question of minimization, the *Holder* court, 331 N.Y.S.2d at 571, and the *Castania* court, 340 N.Y.S.2d at 836, both appear to incorporate by reference lower federal court decisions addressed to this question.

We are aided by the trial court's finding that the law enforcement agents here made a "good faith effort to minimize to the extent practical and electronically possible, within the peculiar circumstances of a narcotics conspiracy—which is one of the most difficult things to surveil and obtain evidence on that I can think of in modern law enforcement . . . ." We held in *Bynum,* 485 F.2d at 500, that "the mere fact that every conversation is monitored does not necessarily render the surveillance violative of the minimization requirement of the statute." What Judge Tyler was talking about here was doubtless that in a narcotics conspiracy the use of code words and cover-up jargon and methods of dealing make investigation most difficult. Here, as in *Bynum,* "it is . . . obvious that no electronic surveillance can be so conducted that innocent conversation can be totally eliminated." *Id.* at 500. Here there was testimony that "most" of the 1,595 calls intercepted were deemed to be "germane" to the narcotics investigation. In all

candor, our examination of the logs and transcription sheets does not lend credit to that testimony.[8] At the same time, here as in *Bynum*, the conspiracy unveiled was a huge business involving millions of dollars' worth of narcotics, numerous distributors and highly complex, surreptitious telephone calls, with numerous callers, male and female, both in and out of the surveilled homes, occupied by persons at least one of whom was openly claiming to be connected with organized crime in the operation of the business. We too fail to see how any detailed screening instructions which could effectively minimize licit telephone interceptions could be devised under these circumstances. Here no claim is made that the Government could have formulated a pattern of innocent calls by which it could have avoided intercepting those. Here no claim is made that any privileged calls were intercepted.[9]

▮ Calls dealing with the narcotics conspiracy were made at all hours of the day or night, so that no minimization by non-use in certain time periods could be attempted. In the sampling of about 100 calls listened to by Agent White, he heard "very few"—indeed he did not remember hearing any—that did not relate to drugs or the proceeds obtained from drugs. Moreover, it is perfectly clear from the record that some seemingly innocuous calls were in fact related to the drug conspiracy; evidentiary

significance could be ascertained only by comparison with other conversations involving the same persons or in the light of facts ascertained either independent of or as a result of the conversation. Finally, it was obvious that the purpose of the wiretaps was not simply to obtain evidence against the telephone subscribers but rather to ascertain the scope and extent of the drug conspiracy under investigation. Given all these facts, we believe that the Government made a prima facie showing of compliance with the minimization provision, and we have the trial court's finding of good faith, in monitoring all the calls from the two key numbers. While it may be that, as Judge Miller said in United States v. Focarile, 340 F.Supp. 1033, 1047 (D. Md.1972), aff'd sub nom., United States v. Giordano, *supra*, "[s]ection 2518(5) . . . requires the intercept procedure to be conducted so as to reduce to the smallest possible number the interception of 'innocent' calls," in this instance the burden clearly shifted to the defendants to make some showing as to how this could be done. They make no suggestion even now. Here, as in *Bynum*, there was no way to frame screening instructions so as to accomplish any non-recording of "innocent" calls. We do not believe that the statute goes further than to require that the methods used to effect minimization be in good faith and reasonable. *Cf.* Berger v. New York, 388 U.S. 41, 53, 87 S.Ct. 1873, 18 L.Ed.

---

8. For example, the court's examination of the Sable court transcript sheets revealed that over 800 of the more than 1,000 calls placed during the period in question were either designated as "non-pertinent" by the transcriber(s) or were calls to which there was either no answer or a busy signal. Only 150 or so calls were designated to be of possible interest.

9. Section 2510(4) defines "intercept" to mean "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." Section 2518(8)(a) requires that "[t]he contents of any wire or oral communication intercepted . . . shall, if possible, be recorded on tape or wire or other comparable device." The record-

ings in turn must be kept under seal until authorized to be opened by court order. In this case, all conversations recorded were also monitored, so, as in *Bynum*, at 502 & n. 6, we need not reach the question whether the statute was intended to apply solely either to aural intrusion or mechanical recordation. Indeed, were all the calls not recorded, ingenious counsel might be claiming that exculpatory conversations or conversations that would place seemingly inculpatory conversations in context were omitted and Brady v. Maryland would be invoked. We also see no reason why, upon proper application by affected parties, subject to order of the court to which returns on the authorizing warrants were made, so-called "non-pertinent" calls could not be erased from the tapes.

2d 1040 (1967), and Katz v. United States, 389 U.S. 347, 355, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). It thus becomes unnecessary for us to determine whether a failure adequately to minimize requires suppression of all the conversations overheard, United States v. Focarile, 340 F.Supp. at 1047; United States v. Scott, 331 F.Supp. 233 (D.D.C.1971), or only nonincriminating conversations. United States v. Cox, 462 F.2d 1293, 1301–1302 (8th Cir. 1972); United States v. King, 335 F.Supp. 523, 543–544 (S.D.Cal.1971).

■ While appellants do not challenge the wiretaps on the basis of lack of probable cause, certain appellants argue that the application for the wiretap orders must be made by the district attorney in person appearing before the judge. While under CPL § 700.05 subd. 5 the "applicant" has to be a district attorney or the attorney general, and under 18 U.S.C. § 2516(2) the applicant must be the "principal prosecuting attorney" of any state or political subdivision thereof, this court held in United States v. Tortorello, *supra*, that the requirement of former § 794 of the CPL (now § 690.35, omitting the very language discussed in *Tortorello*) that "[t]he person seeking the warrant shall appear personally before the judge . . ." related only to the law enforcement officers with personal knowledge who signed the supporting affidavits. Not only does *Tortorello* seem to us to make good sense, but the appellants fail to point to any language in the New York statutes in effect at the time of the issuance of the warrants here that would require any such personal appearance even of the law enforcement officers.

■ The argument that only the district attorney's staff and the state police were authorized to monitor the wiretaps, but in fact federal narcotics agents did so, thus subjecting the wiretaps to attack under 18 U.S.C. § 2518(10)(a)(iii), is without substance. This was at all times a joint investigation, as found by Judge Tyler, and the Rockland County District Attorney specifically relied on BNDD Agent White's affidavit in his application for the original authorizing warrant. It is beyond dispute that, whether decided as a matter of federal or state law, both statutory schemes specifically allow for the disclosure of evidence gained from an authorized wiretap by those authorized to appropriate law enforcement officials not mentioned in the wiretap order. The federal provision, 18 U.S.C. § 2517, and the New York state provision, CPL 700.65, both contemplate the type of cooperation among law enforcement officials which occurred in this case. *See* United States v. Forlano, 358 F. Supp. 56, 59 (S.D.N.Y.1973). If such information may be exchanged after the termination of the surveillance, we perceive no reason why that information may not be disclosed to cooperating agencies contemporaneously with its interception.

■ Finally, appellants argue that the postponement of notice of the surveillance to those persons named in the warrants until on or about June 3, 1972, some six months after the termination of the surveillance, was violative of 18 U.S.C. § 2518(8)(d) and CPL § 700.50 subd. 3, 700.50 subd. 4. No state cases having been brought to our attention on this point, we think that the proper perspective for viewing this question is correctly stated by the Third Circuit:

If, in a given case, there is undue delay [in giving notice], that contention may be pressed in an appropriate averment alleging non-compliance with the statute. The vice of unreasonable delay is a factor to be measured within the contours of the statute, and should not be used to shape those contours into an unconstitutional form. Simply stated, the Congressional mandate places a premium on reasonable notice of the inventory. . . . [C]ourts should exercise great care in granting extensions beyond the ninety-day period for the filing of inventories.

United States v. Cafero, 473 F.2d 489, 500, petition for cert. filed, 42 U.S.L.W. 3018 (U.S. Mar. 26, 1973) (No. 72–1304). Given the complexity of the investigation that continued up until the moment that notice was given in this case, we are extremely reluctant to disturb Judge Tyler's determination below that the postponement authorized by Justice Sweeney was reasonable under all the circumstances. It may be that this holding stretches the interpretation of the statutory provisions to constitutional limits, but if so, we note that none of the appellants have made or attempted to make any showing of prejudice to them as a result of the delay here.

## IV. CONSTITUTIONALITY OF 21 U.S.C. § 848

Appellant Joseph LaCosa's conviction under Count II of the indictment was for "engaging in a continuing criminal enterprise" under 21 U.S.C. § 848(b),[10] and resulted in a 30-year sentence and $100,000 fine thereunder. He argues that the statute is void for vagueness. *See, e. g.,* Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (disorderly person); Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (vagrancy). While it may be true, as the Government argues, that only very infrequently has a *federal* statute been declared unconstitutional on vagueness

grounds, *e. g.,* United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921), this does not answer the basic question whether 21 U.S. C. § 848(b) is constitutionally vague. As Mr. Justice Douglas noted in *Papachristou,* however, "In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed." 405 U.S. at 162, 92 S.Ct. at 843. In this respect § 848 is in a very real sense a regulation—a very severe one, to be sure—of the business of selling drugs. To constitute a "continuing criminal enterprise" there must be a felonious violation of the chapter which is a part of a "continuing series of violations" of Title II or Title III of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513 (Oct. 27, 1970), 84 Stat. 1242, 21 U.S.C. § 801 et seq. & 951 et seq. In addition, the violator must have been acting "in concert with five or more persons" and as to them occupy "a position of organizer, a supervisory position, or any other position of management." Beyond this the violator, or person charged under § 848, must obtain "substantial income or resources" from the enterprise. Section 848 then goes to the business of trafficking in the prohibited drugs on a continuing, serious, widespread, supervisory and substantial basis. The conduct reached is only that which the violator knows is wrongful and contrary to law. *See*

---

10. 21 U.S.C. § 848:

(a)(1) Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 10 years and which may be up to life imprisonment, to a fine of not more than $100,000, and to the forfeiture prescribed in paragraph (2) ; except that if any person engages in such activity after one or more prior convictions of him under this section have become final, he shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a fine of not more than $200,000, and to the forfeiture prescribed in paragraph (2).

(b) For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

Screws v. United States, 325 U.S. 91, 102, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) ("But where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law"). Prerequisite to conviction under § 848 is the commission of a series of felonies, each involving specific intent; that LaCosa did not suspect that his conduct was criminal and violative of law would be risible. *See also* United States v. Ragen, 314 U. S. 513, 524, 62 S.Ct. 374, 86 L.Ed. 383 (1942) (income tax evasion—element of bad faith avoids indefiniteness question in deducting of more than "reasonable" allowances for salaries). *Cf.* Hygrade Provision Co. v. Sherman, 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402 (1925); Omaechevarria v. Idaho, 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763 (1918).

■■■ There is no doubt whatsoever that LaCosa was charged and tried for conducting what must be one of the biggest operations in hard drugs in the New York area; here, as in Williams v. United States, 341 U.S. 97, 104, 71 S. Ct. 576, 580, 95 L.Ed. 774 (1951), it "strains at technicalities to say that any issue of vagueness . . . as construed and applied is present in the case." *See also* United States v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947). That is to say, it is irrelevant that a case may be hypothesized where it is difficult to determine whether a particular defendant were engaged in a "continuing criminal enterprise" under § 848. This serves to distinguish this case from cases like United States v. Singleton, 460 F.2d 1148 (2d Cir. 1972), cert. denied, 410 U.S. 984, 93 S. Ct. 1506, 36 L.Ed.2d 18 (1973), in which a statute penalizing "organized criminal activity" without further definition was, despite doubts from the dissenter, upheld. Here, as in *Petrillo,* the statute might have been more artfully drawn, but no language has occurred or has been suggested to us that better expresses the congressional purpose. To sustain appellant LaCosa's position would force us to hold that words cannot be devised to make it an offense to engage in the continuous sale and trafficking in heroin with a number of other people and with substantial sums of money changing hands; we feel that not to be the case and that, as applied to the conduct with which Joseph LaCosa was charged, *see* Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the statute is not unconstitutionally vague. United States v. Collier, 358 F.Supp. 1351 (E.D.Mich.1973).

## V. PRETRIAL PUBLICITY

Approximately two weeks prior to the commencement of this trial, two nephews of Joseph Manfredi—Philip J. Manfredi, who had previously been charged in the indictment under which this case was brought, and Philip D. Manfredi—were executed in a vacant lot in Bronx County. The various media gave these executions extensive coverage. In the headlines of several New York newspapers 10 to 12 days *before* the trial there appeared such items as "TWO HOODS KILLED; FEAR DRUG WAR" and "SIX DRUG DEALERS VANISH, GANG WAR, SIX DRUG DEALERS MISSING." There also appeared references to appellant Joseph Manfredi as a member of "organized crime" and a caption under a photo "TWO NEPHEWS BUMPED OFF; COPS THINK MAYBE FIGHT FOR DRUG BUSINESS." Apparently television referred to a "$25 million narcotics ring." The trial court refused to grant a continuance and conducted a voir dire, inquiring of the jurors whether they had heard either on the radio or television or read any newspaper or printed account of "anything having to do with this case." Only one of the jurors replied affirmatively, but she could not recall what she read; one other juror thought he might have read something, but wasn't sure. The appellants argue that reference to Philip J. Manfredi's name, coupled with his ab-

sence from the trial and references to certain locations in the Bronx, "very likely supplied the catalyst for association by jurors" with what had been earlier disseminated by the media. It is the failure of the trial court to grant a continuance in view of the pre-trial publicity that is said to constitute prejudicial error, and it is argued that this case is one of such extreme "inherently prejudicial publicity" that the actual existence of prejudice in the jury box need not be shown. *Cf.* Hale v. United States, 435 F.2d 737, 746 (5th Cir. 1970), cert. denied, 402 U.S. 976, 91 S. Ct. 1680, 29 L.Ed.2d 142 (1971).

█ But the publicity here did not deal with the issue of guilt or innocence in the case itself. United States v. Persico, 425 F.2d 1375, 1380 (2d Cir.), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L. Ed.2d 108 (1970); United States ex rel. Gallo v. New York State Department of Correctional Services, 335 F.Supp. 915, 918 (S.D.N.Y.1972). Moreover, the voir dire—which seems to have been conducted fairly—disclosed no recall of the 10-day-old stories. *See* United States v. Dioguardi, 428 F.2d 1033, 1039 (2 Cir.), cert. denied, 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970); United States v. Agueci, 310 F.2d 817 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963); United States ex rel. Gallo v. New York State Department of Correctional Services, *supra*. In times of fast-moving news events of all kinds one really cannot be surprised at what appears to be a short memory on the part of the public generally or the cross-section of it included on a given jury panel. Appellants' sense of their own importance in their analogizing this case to the Watergate is greater than this court's. We do not believe, in short, that the trial court's "broad discretion," United States v. Persico, 425 F.2d at 1382, in this area of prejudice from pretrial publicity was here abused by the denial of the continuance. We point out that this is not a case of *in-trial* publicity like Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.

Ed.2d 1250 (1959), or Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L. Ed.2d 600 (1966). *See also* United States v. Palmieri, 456 F.2d 9, 13–14 (2d Cir.), cert. denied, 406 U.S. 945, 92 S.Ct. 2054, 32 L.Ed.2d 332 (1972).

Judgment affirmed.