UNITED STATES of America,
Plaintiff-Appellee,

v.

Garland JEFFERS, Defendant-Appellant.

No. 75–1422.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1976.

Decided March 30, 1976.

Rehearing Denied May 18, 1976.

Stephen C. Bower, Kentland, Ind., for defendant-appellant.

John R. Wilks, U.S. Atty., Fort Wayne, Ind., Richard A. Hamming, Asst. U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Before PELL and SPRECHER, Circuit Judges, and PARSONS, Chief District Judge.*

SPRECHER, Circuit Judge.

This appeal arising from the conviction of the defendant for engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848 primarily concerns the question of whether the conviction is barred on double jeopardy grounds by a prior conviction for conspiracy to distribute narcotics.

I

The evidence presented at trial showed that the defendant, Garland Jeffers, was the head of a highly-structured narcotics distribution network which operated in Gary, Indiana from January of 1972 to mid-March of 1974. The organization, known as "the Family," was formed by Garland Jeffers and five others to organize and control the drug traffic in the city of Gary. Although, at first, the defendant did not head up the Family, he quickly assumed control so that within a few months the organization, which had started as a cooperative venture, became his personal enterprise.

A number of individuals worked as members of the Family at one time or another. Ten members testified at the trial laying out the structure and operation of the organization and the methods employed by it to control the drug traffic in Gary.

During its course of operation, the Family distributed between one and two thousand capsules of heroin a day. Two witnesses whose primary function in the Family was cutting the heroin, testified that Jeffers obtained the undiluted heroin which was then cut (one ounce of heroin often making as many as 1,300 capsules) and

passed on to the street distributors who worked for the Family. During 1972, the Family charged five dollars on the street for a capsule of heroin. In 1973, the price increased to ten dollars. Out of that price, the pusher got twenty percent and remitted the rest to the Family. From these sales (after commissions) the Family took in about $5,000 per day.

To get and retain its exclusive control over the drug traffic in Gary, the Family robbed other drug distributors of their drugs and money. If an independent drug dealer wanted to remain in business, he had to pay tribute to the Family. One independent dealer testified that he paid the Family four or five hundred dollars per day for the better part of a year to be allowed to deal in drugs in Gary.

Jeffers was installed, at first, as treasurer of the Family because he was the only non-addict in the group. This, however, appeared to be a tactical mistake because within a short period the money that the Family took in through extortion, robbery and drug sales became the sole property of the defendant. Jeffers gave the rest of the Family members salaries for their efforts except the street workers who were paid by commissions. The enforcers and other middlemen were paid at first $100 per week and later $200 per week. Isaac Davis testified that in 1972 twelve members received $100 per week and in 1973 fourteen or fifteen received $200 per week. The members who cut the heroin and controlled the distribution process were paid $500 per week. Willie J. Williams, who had been a cutter for the Family, received $1,000 per week when he took over a large part of the management of the organization. Williams testified that he was present on two occasions when the defendant purchased an automobile for a member of the Family and also testified that Jeffers paid rent on at least two dwellings in which members of the Family lived. Isaac Davis similarly tes-

---

* Chief District Judge James B. Parsons of the United States District Court for the Northern District of Illinois is sitting by designation.

tified that Jeffers bought cars for members of the Family and paid their rent.

Beyond paying Family members, Jeffers exercised strong control over the group. He issued severe beatings to Family members who "messed up." On two occasions, he shot members of the Family for disciplinary purposes. On one occasion, he had been beating a number of Family members and was evidently "wore out." So instead of issuing the final member a beating, Jeffers made him lie on the floor and then walked over and shot him in the leg.[1] On the other occasion, Isaac Davis related that he, Jeffers and a street worker for the Family went over to James Berry's house to straighten out some complaints Berry had been making about not receiving a fair share of the money. They got Berry out of bed, took him next door and shot him five times in the leg. He was then taken to a hospital.

The defendant profited handsomely from the business. Several witnesses testified that the Family took in about $5,000 per day (exclusive of street commissions). Williams testified that Jeffers received around $25,000 per week in net profits from drug sales alone. This figure would occasionally dip below $20,000, and would at times rise to $50,000 per week. Other income was coming in through extortion and robbery. Jeffers bought a $37,000 house, more than $2,000 in clothes, $4,200 in furniture, a $900 pool table, several cars for the Family members, paid rent on Family dwellings and kept up a substantial payroll. In 1973, Jeffers paid more than $21,000 in legal fees. Taking an extremely conservative estimate that Jeffers made a net income of $10,000 per week over the two-year and two-month period during which the Family operated, Jeffers' income for the entire period totals over a million dollars.

The trial at which this evidence was presented lasted seven days. The government produced more than thirty witnesses who testified to all aspects of the Family's operation and to elements of Jeffers' in-

come. The jury deliberated for thirty minutes before finding the defendant guilty as charged in the indictment. Garland Jeffers was sentenced to life imprisonment to be served consecutively with his 15 year sentence for conspiring to distribute heroin and cocaine.

## II

We turn first to the question of whether Jeffers' conviction for engaging in a continuing criminal enterprise is barred by a prior conspiracy conviction involving the same events.

### A

On March 18, 1974, Garland Jeffers and nine others were indicted in the Northern District of Indiana for violations of 21 U.S.C. § 846, conspiracy to distribute heroin and cocaine. The indictment alleged that "[f]rom on or about November 1, 1971 . . . to and including the date of this indictment . . . the defendants . . . did unlawfully, knowingly and wilfully conspire, combine, confederate and agree . . . to distribute heroin . . . and to distribute cocaine. . . ." The indictment further alleged that the conspiracy was to be accomplished by operating "an organization known as the 'Family,'" and that "[t]he purpose of 'The Family' organization was to . . . control the traffic in heroin and cocaine in and around the city of Gary, Indiana." A trial was held on this indictment and on June 26, 1974 Garland Jeffers and six others were found guilty of conspiracy to distribute narcotics as charged in the indictment. We affirmed that conviction in *United States v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975).

On the same day that the conspiracy indictment was handed down, the indictment charging Garland Jeffers with violations of 21 U.S.C. § 848, engaging in a continuing criminal enterprise, was also handed down. This indictment alleged that "[o]n or about the 1st day of November 1971, . . . and continuing to the date of this indict-

---

1. This particular incident was disputed by the defendant, as the defense called Paul Griffin, the purported victim, to the stand and Griffin testified that he had never been shot by Jeffers.

ment . . . Garland Jeffers . . . did engage in continuing criminal enterprise in that he did distribute and possess with intent to distribute heroin, . . . and cocaine, . . . and undertook such distribution in concert with five or more other people in respect to whom he occupied a position of organizer, supervisor and manager and further as a result of such distribution and other activity obtained substantial income in violation of Section 848, Title 21 of the United States Code." Thus, the indictments cover the same time period and, as seen from the evidence adduced at the continuing criminal enterprise trial, involve the same narcotics distribution ring.

The government attempted to consolidate the trial on the criminal enterprise charge with the conspiracy trial. The defendants in the conspiracy trial, including Garland Jeffers, objected strenuously to the consolidation on a number of grounds, focusing primarily on the contentions that conspiracy and continuing criminal enterprise were not "the same" and that great prejudice would result to Garland Jeffers in the criminal enterprise charge by bringing in evidence as to co-conspirators in the conspiracy which did not directly inculpate Garland Jeffers. The trial court held that the trials could not be joined.

Prior to trial on the continuing criminal enterprise charge (but after the conspiracy trial) Garland Jeffers filed a motion to dismiss the criminal enterprise indictment on double jeopardy grounds. The trial court denied the motion and a trial was held. On March 26, 1975, the jury returned the guilty verdict.

### B

The basis for all double jeopardy claims resides in the Fifth Amendment guarantee

that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The defendant contends on appeal that conspiracy and continuing criminal enterprise are "the same offense" for double jeopardy purposes. The defendant argues that the crime of conspiracy charged in the first indictment was a lesser included offense of the crime of engaging in a continuing criminal enterprise, and that as such the offenses are considered the same under the double jeopardy clause.

■ The Supreme Court has written that a lesser included offense must "be included within but not, on the facts of the case, be completely encompassed by the greater [and that] the . . . greater offense requires . . . a disputed factual element which is not required for conviction of the lesser-included offense." *Sansone v. United States,* 380 U.S. 343, 350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882, 888 (1965). Thus, all the elements of the offense must be included within the greater so that proof of the greater necessarily proves the lesser. *James v. United States,* 238 F.2d 681, 683 (9th Cir. 1956), *Government of the Virgin Islands v. Carmona,* 422 F.2d 95, 100 (3d Cir. 1970).

■ Conspiracy to distribute narcotics falls within the definition of a lesser included offense of continuing criminal enterprise. The elements of a continuing criminal enterprise include, inter alia, that the accused engaged in a continuing series of violations of the Controlled Substances Act which are undertaken *in concert* with five or more other persons with respect to whom the accused occupies some supervisory position.[2] Since a criminal enterprise charge requires proof that the accused acted in

2. Section 848(b) of Title 21 provides:
. . . a person is engaged in a continuing criminal enterprise if—
(1) he violates any provision of this title or Title III the punishment for which is a felony, and
(2) such violation is a part of a continuing series of violations of this title or Title III—
(A) which are undertaken by such person in concert with five or more other persons with

respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
(B) from which such person obtains substantial income or resources.
Section 846 of Title 21 provides:
Any person who attempts or conspires to commit any offense defined in this title is punishable by imprisonment or fine or both which may not exceed the maximum punish-

concert with five or more persons, it requires proof of a conspiracy. The proof·at the criminal enterprise trial that Garland Jeffers in concert with five or more individuals engaged in a continuing series of violations of the Controlled Substances Act, necessarily proved that Garland Jeffers had engaged in a drug conspiracy as charged in the first indictment. Thus, the conspiracy charge under the standard definition is a lesser included offense of the continuing criminal enterprise charge.

Since 1911, the Supreme Court has held that conviction of what we now call a lesser included offense, bars subsequent prosecution for the greater offense. In *Gavieres v. United States*, 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489 (1911), the Court was asked to overturn Gavieres' conviction for insulting a public officer on the grounds that it was barred by the petitioner's prior conviction for drunkenness in public arising from the same acts. The Court saw the question as one of defining the scope to be given to the guarantee against being twice placed in jeopardy.

> It is to be observed that the protection intended and specifically given is against second jeopardy for the *same offense*. The question, therefore, is, Are the offenses charged . . . identical?

*Id.* at 341–42, 31 S.Ct. at 422, 55 L.Ed. at 490. The Court answered this question by taking the view propounded by Judge Gray of the Supreme Judicial Court of Massachusetts in *Morey v. Commonwealth*, 108 Mass. 433 (1871). Judge Gray wrote:

> A conviction or acquittal upon one indictment is no bar to a subsequent conviction and sentence upon another, unless the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other. The test is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense. A single

act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

*Id.* at 434, quoted at 220 U.S. at 342, 31 S.Ct. at 422, 55 L.Ed. at 490. By this test, a lesser included offense and its greater offense will always be considered the same for double jeopardy purposes since the elements of the lesser offense are always included within the greater and thus, proof of the greater would be sufficient to warrant a conviction on the lesser.

The *Gavieres* test has continuing vitality as it was relied upon in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932). In *Blockburger* the Court had to decide whether the petitioner who was convicted of two offenses arising out of the same acts could be sentenced to serve consecutive terms for the offenses. The issue was resolved in double jeopardy terms in that the Court saw the question as "whether, both sections being violated by the same act, the accused committed two offenses or only one." *Id.* The Court resolved the question by relying upon the *Gavieres* formulation. It wrote:

> Each of the offenses created requires proof of a different element. The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. *Gavieres v. United States*, 220 U.S. 338, 342 [31 S.Ct. 421, 422, 55 L.Ed. 489, 490]. (*Id.*)

The *Gavieres* test basically holds that conviction of the greater or lesser offense, bars prosecution for another included offense. *Blockburger* extended this by hold-

---

ment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

Although § 848 applies as well to violations of Title III (the Controlled Substances Import and

Export Act) while § 846 does not, there was no question in this case but that the violations charged were of the Controlled Substances Act (referred to as "this Title" in both sections).

ing that a person could only be punished for one of a series of included offenses, even though he may have been convicted of all the offenses at the same trial.[3]

### C

In the recent case of *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), the Supreme Court seems to have formed a new double jeopardy approach towards complex statutory crimes. In *Iannelli* eight defendants were each convicted on basically the same facts both of running an illegal gambling business in violation of 18 U.S.C. § 1955 and of conspiracy to run such a business, 18 U.S.C. § 371. The petitioners challenged their convictions and sentences claiming that the conspiracy charge should have merged with the substantive offense under Wharton's Rule and that punishment on both offenses violated the fifth amendment guarantee against double jeopardy. The Court upheld their convictions and sentences relying on a perceived congressional intention to retain each offense as an "independent curb" in the war against organized crime. 420 U.S.

at 791, 95 S.Ct. at 1296, 43 L.Ed.2d at 630. The double jeopardy contention was passed over in a footnote, *id.* at 785 n.17, 95 S.Ct. at 1293, 43 L.Ed.2d at 627, and the theme of the opinion seems to be that at least in the area of complex statutory crimes, if Congress intends that two offenses be retained as independent offenses, prosecution under both is permissible.

The elements required to prove a § 1955 violation include: 1) conducting, managing, supervising, a gambling business which is in violation of state law, 2) which "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business," 3) and which remains in substantially continuous operation in excess of thirty days or has gross revenue of $2,000 in any single day.[4] The requirement that the business involve five or more persons in supervisory positions clearly constitutes a requirement for some sort of concerted activity. If five or more persons own, manage or supervise a business, they certainly have an agreement, either explicit or tacit to operate the business, and have joined in a conspiracy for that purpose.[5]

---

**3.** These rules appear to be underlying assumptions of present thinking on the double jeopardy issue. For instance, in *Waller v. Florida*, 397 U.S. 387, 390, 90 S.Ct. 1184, 1186, 25 L.Ed.2d 435, 438 (1970), the Court acted "on the assumption that the ordinance violations were included offenses of the felony charge" and reversed the state felony prosecution because of the prior municipal prosecution on the ordinance charge holding that the dual sovereignty theory did not apply to state and municipal governments. Similarly, in *Robinson v. Neil*, 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973), which held *Waller v. Florida* retroactive, the Court remanded the habeas corpus action for a determination of whether in fact the offenses of which the prisoner was convicted were the same. The district court, in *Robinson v. Neil*, 366 F.Supp. 924, 929 (E.D.Tenn. 1973), held that since the parties had stipulated that the municipal offense was a lesser included offense of that charged in the subsequent state prosecution, the state conviction was barred on double jeopardy grounds. Applying this to the present situation, the result seems to be that Garland Jeffers' conviction for engaging in a continuing criminal enterprise must be reversed. However, we are not convinced that this rather mechanical analysis should control the disposition of the case.

**4.** 18 U.S.C. § 1955 reads in relevant part:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, book-making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein. . . .

**5.** See *United States v. Cortwright*, 528 F.2d 168 at 172 (7th Cir. 1975), where we noted that "Conspiracy in its broadest definition 'is a partnership in criminal purposes,'" quoting *United States v. Kissel*, 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168, 1178 (1910). Five or more

The only element required to prove a conspiracy under 18 U.S.C. § 371 to violate § 1955 is an agreement to run an illegal gambling business (and an overt act in furtherance of the agreement). This requirement of concerted activity is also an element of § 1955. By a traditional analysis, then, the conspiracy charge is a lesser included offense of a substantive charge under § 1955. If it is proven that a person managed, supervised or directed, along with five other people an illegal gambling business, certainly, it has also been proven that he conspired to run an illegal gambling business.[6]

Under the traditional analysis of *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), punishment could not be imposed for two offenses, one of which contains all the elements of the other (i. e., for both the lesser included offense and the greater). The Court in *Iannelli*, however, characterizes *Blockburger* as a tool for statutory interpretation rather than a double jeopardy decision by suggesting that it "serves a . . . function of identifying congressional intent to impose separate sanctions for multiple offenses arising in the course of a single act or transaction." 420 U.S. at 785 n.17, 95 S.Ct. at 1293, 43 L.Ed.2d at 627. The focus

of *Blockburger* which centered on whether two offenses were "the same" to determine whether the imposition of sentences on both offenses constituted double punishment, has been shifted by the characterization given it in the *Iannelli* opinion. Thus, the focus to determine if two offenses are "the same" for double jeopardy purposes, at least in regard to complex statutory crimes, now appears to center on the congressional intent with regard to such crimes. The Court in *Iannelli* in dealing with the application of Wharton's Rule to the situation there, wrote:

> [A]s the Rule is essentially an aid to the determination of legislative intent, it must defer to a discernible legislative judgment.

*Id.*, at 786, 95 S.Ct. at 1294, 43 L.Ed.2d at 628. And concluded:

> We think it evident that Congress intended to retain each offense as an "independent curb" available for use in the strategy against organized crime.

*Id.*, at 791, 95 S.Ct. at 1296, 43 L.Ed.2d at 630.

For offenses derived from the common law and for simple statutory crimes, the *Gavieres-Blockburger* tests provide an important safeguard and serve a useful func-

---

people running an illegal business would fall within that definition. We also noted in *Cortwright, id.*, that "[i]n a conspiracy . . . '[t]he formalities of an agreement are not necessary and are usually lacking,'" quoting *United States v. Varelli*, 407 F.2d 735, 741 (7th Cir. 1969). Therefore, it cannot be questioned that § 1955, at least tacitly requires proof of a conspiracy.

6. The Court in *Iannelli* tries to make an argument that § 1955 and conspiracy to violate § 1955 require different elements for conviction for each offense. Certainly, as the Court points out, 420 U.S. at 785 n.17, 95 S.Ct. at 1293, 43 L.Ed.2d at 627, the statutory definition of the § 1955 offense does not explicitly contain the required element of agreement. However, it is difficult to imagine how one can prove that five or more people managed a gambling business without also having proved that they operated under an agreement to do just that. As Justice Douglas wrote in his dissent to *Iannelli*:

> The evidence established, in the Government's view, "syndicated gambling," the kind of activity proscribed by § 1955. The very

same evidence was relied upon to establish the conspiracy—a conspiracy, apparently, enduring as long as the substantive offense continued, and provable by the same acts that established the violation of § 1955. Thus the very same transactions among the defendants gave rise to criminal liability under both statutes.

420 U.S. at 792, 95 S.Ct. at 1297, 43 L.Ed.2d at 631. The Court itself even recognizes that there is a "concerted activity" requirement in § 1955, but says the only purpose of this element was to limit federal prosecutions to large scale gambling activities. *Id.*, at 790, 95 S.Ct. at 1296, 43 L.Ed.2d at 630. Similarly, the Court seems to agree with Justice Douglas' conclusion that the same evidence which proves a § 1955 violation can also prove a conspiracy violation when it notes that prosecutors should not always seek conviction under both § 1955 and the conspiracy statute, but should use their discretion in prosecuting under one statute or another. *Id.*, at 791, 95 S.Ct. at 1296, 43 L.Ed.2d at 630.

**1110**

tion. For instance, with regard to the numerous degrees of homicide from first-degree murder down through manslaughter and reckless homicide, the reason that the different degrees exist is not so that numerous convictions can be obtained against one defendant, but so that for one homicide, the proper degree of censure and punishment can be meted out. It would be totally improper for society after it had chosen the proper degree of censure and punishment for an individual, for instance by conviction for manslaughter, then to try and obtain a higher degree by prosecuting the individual for first-degree murder. Society has made its choice with regard to characterizing the homicide committed by the defendant, and should not be allowed to change it.

■ In regard to highly complex statutory crimes, however, the included offense tests are often not appropriate to determine whether two offenses should be classed as "the same," because often, even though these offenses meet the included offense test, they are directed at quite different results. For instance, in the present case, conspiracy and continuing criminal enterprise are aimed at punishing different things. Conspiracy is aimed at the evil of collective criminal agreement, and seeks to attack problems quite apart from the evil of the underlying offense, for as noted in *Cal-*

*lanan v. United States*, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312, 317 (1961), "[c]oncerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality."

■ The crime of engaging in a continuing criminal enterprise is aimed at something much different than just punishing concerted drug violations. Congress first included continuing criminal enterprise in the Drug Control Act, not as an independent crime, but as a sentencing alternative, the purpose being to severely punish those criminals who made a substantial living by violating the drug laws.[7] For procedural and constitutional reasons,[8] the original proposal was changed to create an independent crime. However, the purpose of the provision did not change. The purpose, to punish and take out of circulation persons who are engaged in the manufacture and sale of drugs primarily for the profits to be derived therefrom, is evident in both the provision itself, and the legislative history. The provision, 21 U.S.C. § 848(b)(2)(B), requires as proof of engaging in a continuing criminal enterprise that the defendant be shown to have derived substantial profits from the enterprise. As part of the penalty provision, it allows imposition of large fines

7. In its original form, the continuing criminal activity part of the Drug Control Act resembled in procedure and effect the dangerous special offender provision enacted as 18 U.S.C. § 3575. In the additional views appended to H.R.Rep. No.1444, 91st Cong., 2nd Sess. (1970) (to accompany H.R.18583), 1970 U.S.Code Cong. & Admin.News pp. 4566, 4649, the operation of the original provision was described in this way:

> In . . . H.R.18583 in its original form, the prosecuting attorney is called upon, in order to institute the special sentencing procedures, to file with the court an instrument specifying that the defendant falls in the category of a special offender, in which case special procedures are provided for sentencing.
> [The bill provides] for a hearing before sentencing wherein the defendant is permitted the ordinary representation and process, except that he is to be afforded only "the substance of such parts of the presentence re-

port as the court intends to rely upon" and this only if there are not "placed in the record compelling reasons for withholding particular information."

8. As is pointed out in the additional views to H.R.Rep.No.1444, 91st Cong., 2nd Sess. (1970) (to accompany H.R.18583), 1970 U.S.Code Cong. & Admin.News pp. 4566, 4650–51, the original version withheld much information from the defendant, allowed the use of hearsay evidence in the sentencing proceeding, and assumed that any substantial income or resources in the defendant's name or under his control were derived from unlawful activities unless the defendant proved otherwise. All these factors appeared to the committee to be of questionable constitutional validity. So, "[i]nstead of providing a post-conviction-presentencing procedure, [the committee] made engagement in a continuing criminal enterprise a new and distinct offense with all its elements triable in court." *Id.* at 4651.

($100,000), 21 U.S.C. § 848(a)(1), and permits forfeiture of all profits from the enterprise along with any interest, or any claim in any property or contractual rights in the enterprise. 21 U.S.C. § 848(a)(2). The House Committee Report which accompanied the bill spoke of providing "severe criminal penalties for persons engaged in illicit manufacture or sale of controlled drugs *primarily for the profits to be derived therefrom.*" H.R.Rep.No.1444, 91st Cong., 2nd Sess. (1970) (to accompany H.R. 18583), 1970 U.S.Code Cong. & Admin.News pp. 4566, 4575. The report also noted that the continuing enterprise provision "is intended to serve as a strong deterrent to those who otherwise might wish to engage in the illicit traffic, while also providing a means for keeping those found guilty of violations out of circulation." *Id.* at 4576. The difference between conviction for engaging in a continuing criminal enterprise and engaging in a conspiracy to violate the drug laws is not just one of the degree of censure and punishment to be meted out for one's violation of the drug laws.[9] It is a difference in character and purpose. From reading the legislative history, we conclude that Congress did not intend that continuing criminal enterprise be just another degree of conspiracy, but intended that it be a substantially separate crime, an independent weapon in the government's arsenal in the war on illicit drugs.[10]

■ From this analysis, then, we conclude that the conspiracy charged in the first indictment and the continuing criminal enterprise charged in the second indictment were not the "same offense" for double jeopardy purposes,[11] and a prior conviction on the first indictment did not bar prosecution on the second.[12]

### III

Prior to trial, the defendant made a verified motion for change of judge in accordance with 28 U.S.C. § 144. The defendant contended that since Judge Sharp had already sat at numerous trials concerning the exploits of the Family, and since the judge had presided at the defendant's prior conspiracy trial, the judge was prejudiced against the defendant and was required to

**9.** The Court in *Iannelli* wrote:

Nor do we find merit to the argument that the congressional requirement of participation of "five or more persons" as an element of the substantive offense under § 1955 represents a legislative attempt to merge the conspiracy and the substantive offense into a single crime. The history of the Act instead reveals that this requirement was designed to restrict federal intervention to cases in which federal interests are substantially implicated. 420 U.S. at 789, 95 S.Ct. at 1296, 43 L.Ed.2d at 630. Similarly, the congressional requirement that the participation of "five or more persons" must be shown to prove a continuing criminal enterprise charge seems only to be an attempt to restrict the harsh sanctions of the provision to those who are engaged in a large-scale ongoing business in narcotics. If Congress had wanted to merge continuing criminal enterprise and conspiracy, it could have spoken distinctly to that point.

**10.** As the Court in *Iannelli* noted:

The historical difference between the conspiracy and its end has led this Court consistently to attribute to Congress "a tacit purpose—in the absence of any inconsistent expression—to maintain a long-established distinction between offenses essentially different—a distinction whose practical importance in the criminal law is not easily overestimated."
420 U.S. at 779, 95 S.Ct. at 1291, 43 L.Ed.2d at 624, quoting *Callanan v. United States,* 364 U.S. 587, 594, 81 S.Ct. 321, 325, 5 L.Ed.2d 312, 317 (1961).

**11.** This conclusion similarly takes care of defendant's claim that the consecutive sentences constitute double punishment under the double jeopardy clause of the constitution.

**12.** This result appears sensible especially in light of the fact that the Court refuses to accept the "same transaction" theory of double jeopardy espoused by Justices Douglas, Brennan and Marshall. See Justice Brennan's concurring opinion in *Ashe v. Swenson,* 397 U.S. 436, 448–460, 90 S.Ct. 1189, 1196, 25 L.Ed.2d 469, 478 (1970). See also *Robinson v. Neil,* 409 U.S. 505, 511, 93 S.Ct. 876, 879, 35 L.Ed.2d 29, 34 (1975) (Brennan, J., concurring), and *Harris v. Washington,* 404 U.S. 55, 57, 92 S.Ct. 183, 184, 30 L.Ed.2d 212, 215 (1971) (separate statement of Justices Douglas, Brennan and Marshall). The included offense theories, if applied to complex statutory crimes create hypertechnical classifications for offenses, which catch prosecutors off guard by holding offenses which would not normally be considered similar "the same."

recuse himself. Judge Sharp denied the motion and presided at the trial.

■ A judge when presented with a timely motion under § 144 must recuse himself if the motion alleges facts sufficient to show judicial bias even though he may know them to be entirely false. *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921). The judge may not judge the verity of the facts presented, but must judge their sufficiency. *Hodgson v. Local 2, Distillery Workers,* 444 F.2d 1344, 1348 (2nd Cir. 1971). The two basic facts presented by the defendant's motion are 1) that Judge Sharp had presided and would preside over numerous trials concerning alleged Family members, and 2) that Judge Sharp presided at the defendant's prior trial. The defendant alleged no facts which directly showed Judge Sharp's bias, but relied only on the inference that the intimate connection with the defendant's prior trial and other Family trials would create bias.

■ We have dispatched this type of claim before. In *United States v. Dichiarinte,* 445 F.2d 126, 132 (7th Cir. 1971), Judge Swygert wrote:

> The fact that the judge might have formed an opinion concerning the guilt or innocence of the defendant from the evidence presented at an earlier trial involving the same person is not the kind of bias or prejudice which requires disqualification.

*Accord, Wolfson v. Palmieri,* 396 F.2d 121 (2nd Cir. 1968). Similarly, "inferences drawn from prior judicial determinations are insufficient grounds for recusal because it is the duty of the judge to rule upon issues of fact and law and questions of conduct which happen to form a part of the proceedings before him." *United States v. Partin,* 312 F.Supp. 1355, 1358 (E.D.La. 1970). In the Watergate conspiracy trial of Mitchell, Ehrlichman, Colson and others, several defendants moved for the recusal of Chief Judge Sirica, because of his involvement in so many aspects of the Watergate indictments and prosecutions. In a lengthy and well-written opinion, Judge Sirica denied recusal on the ground that the allega-

tions showed only prior judicial actions, and that no "personal" as opposed to "judicial" bias had been alleged. *United States v. Mitchell,* 377 F.Supp. 1312, 1320 (D.D.C. 1974). As Judge Sirica noted *id.* at 1316, citing *Beland v. United States,* 117 F.2d 958, 960 (5th Cir.), *cert. denied,* 313 U.S. 585, 61 S.Ct. 1110, 85 L.Ed. 1541 (1941), "[t]he judge is presumed impartial." All the defendant alleged in this case was prior judicial actions on the part of Judge Sharp. If from these we infer that Judge Sharp developed personal bias towards the defendant, we are overlooking the basic presumption that a judge approaches each new case with impartiality and conducts the case on its own merits from the evidence there presented quite apart from any other case he might have heard. If the rule were otherwise, the Family would long ago have run through the judges in Indiana and possibly in all of the Seventh Circuit.

## IV

Prior to trial, the defendant moved to dismiss the continuing criminal enterprise indictment on the grounds that the indictment was insufficient, because it failed to state an essential element of the crime— that violation of the federal drug laws was part of "a continuing series of violations." We have recently held that when an indictment fails to allege an essential element of the offense sought to be charged the indictment is insufficient as a matter of law. See the opinion of the Judge Castle in *United States v. Wabaunsee,* 528 F.2d 1, at 4 (7th Cir. 1975). Judge Castle, however, noted in the *Wabaunsee* opinion that the exact wording of the required element need not be present if "words of similar import" supply the required element. *Id.* at 2 citing *United States v. Airdo,* 380 F.2d 103, 105 (7th Cir.), *cert. denied,* 389 U.S. 913, 88 S.Ct. 238, 19 L.Ed.2d 260 (1967). The *Airdo* case noted that:

> The test of sufficiency is whether [the indictment] informs the defendant of what charges he must meet and protects him against double jeopardy.

380 F.2d at 104. In the *Wabaunsee* case, in a prosecution for transporting stolen goods across state lines, the indictment failed to allege the element of knowledge as to whether the goods were stolen. In the *Airdo* case, the element of knowledge was similarly absent in an indictment charging the defendant with unlawful possession of goods stolen from interstate commerce. However, the *Airdo* indictment contained the phrase that the defendant "did unlawfully buy, receive, and have in his possession" a television set. The court held that in that context the word unlawfully supplied the required element of knowledge because "[p]ossession of a television set recently stolen from an interstate shipment could be 'unlawful' . . . only if the possession were accompanied by knowledge that the set had been stolen." *Id.* at 105.

■■■ In the present case, the defendant asserts that the indictment failed to allege that violation of the federal drug laws was "a part of a continuing series of violations" as required by 21 U.S.C. § 848(b)(2). The indictment reads, in relevant part:

> On or about the 1st day of November 1971, . . . and continuing to the date of this indictment, . . . GARLAND JEFFERS . . . did engage in [a] continuing criminal enterprise in that he did distribute and possess with intent to distribute heroin, . . . in violation of Title 21 United States Code, Section 841(a)(1), a felony, and cocaine, . . . in violation of Title 21 United States Code, Section 841(a)(1), a felony.
> . . .

This indictment lays out four substantive offenses, distribution and possession with intent to distribute both heroin and cocaine. It relates that the defendant "did engage" in these offenses from "on or about" November 1, 1971 and "*continuing* to the date of this indictment." From this it can only be inferred that the indictment charges a continuing series of violations, and that the indictment was sufficient to apprise the defendant of what charges he must meet.[13]

## V

About two weeks prior to trial, the defendant filed motions for a bill of particulars and additional discovery, directed primarily at the substantial income element of the indictment. The trial court denied these motions, after the prosecution had advised both the court and the defendant that proof on the element of "substantial income" would come in two forms: 1) money given defendant and seen in his possession; and 2) by proof of specific expenditures which when added together would constitute a substantial amount of money. The defendant contends that the trial court abused its discretion in denying the motions.

■■■ A motion for bill of particulars under Rule 7(f), Fed.R.Crim.P., is directed to the sound discretion of the trial court even under the liberalized 1966 amendments to that rule.[14] In *United States v. Holovachka*, 314 F.2d 345, 349 (7th Cir. 1963), we held that in a tax evasion case denial of a bill of particulars was not an abuse of discretion, when in response to such motion the government informed the defendant that "it proposed to prove his correct taxable income . . . for each year . . . by the net worth plus nondeductible expenditure method of proof." In light of the fact that in this case the government disclosed exactly the same material, (i. e., its theory of the case) plus a great deal of other material, we cannot say

---

13. Also, the name of the crime itself, "continuing criminal enterprise", apprises the defendant to some extent that the government is charging a continuing series of violations.

14. We agree with the Third Circuit when it noted that:

> . . . the amendment was intended to liberalize the court's attitude towards bills of particulars. . . . However, the Committee, as well as the federal courts, have made clear that amended Rule 7(f) leaves undisturbed the discretionary nature of the granting of a bill of particulars.

*United States v. Conway*, 415 F.2d 158, 161 (3rd Cir. 1969), *cert. denied*, 379 U.S. 994, 90 S.Ct. 1131, 25 L.Ed.2d 401 (1970).

the denial of the motion constituted an abuse of discretion.[15]

## VI

 The defendant cites a number of alleged errors concerning the admission of evidence, and suggests that these require reversal of his conviction.[16] The only substantial contention in this group relates to whether the compelled testimony of the defendant's former attorney in regard to the amount of attorney's fees paid by the defendant in 1973 violated his attorney-client privilege. At the outset, we note that this information was clearly relevant to the issue of substantial income under the government's theory of gross expenditures.

 Dean Wigmore in his classic treatise on evidence laid down the fundamental policy behind the attorney-client privilege:

> In order to promote freedom of consultation of legal advisers by clients, the apprehension of compelled disclosure by the legal advisers must be removed; hence the law must prohibit such disclosure except on the client's consent.

8 Wigmore on Evidence § 2291 (McNaughton rev. 1961). In regard to the disclosure of the amount of attorney's fees paid by a

---

**15.** In his final contention regarding matters prior to the taking of evidence, the defendant claims that the voir dire was insufficient in that the trial judge failed to sufficiently question prospective jurors concerning their racial prejudices. The defendant admits that the court asked the general question "would the color of a man's skin affect your decision?" This question alone, however, is sufficient to meet standards set forth in *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). There the court held that a trial judge must question prospective jurors on the issue of racial prejudice, but that the judge "was not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by petitioner." *Id.* at 527, 93 S.Ct. at 850, 35 L.Ed.2d at 50. Moreover, we note that *Ham* did not announce a constitutional requirement applicable to all criminal cases, but only those which exhibited the unusual circumstances present in *Ham*. *Ristaino v. Ross*, —— U.S. ——, 96 S.Ct. 1017, 47 L.Ed.2d 258, 44 U.S.L.W. 4305 (March 3, 1976). Such circumstances are not present in this case. Furthermore, the petitioner failed to make timely objections or to request additional voir dire. Hence, we cannot say the failure to further question jurors on the subject was plain error.

**16.** The defendant contends that on the issue of substantial income, he should have been allowed to present in evidence the fact that his lawyer in the trial was court appointed. This request was denied for the obvious reason, that the fact is not relevant to the question of substantial income. Jeffers fired his former lawyers prior to trial and refused to secure other counsel. Finally, the court was required to appoint counsel so that the trial could proceed. Clearly, counsel was not appointed because of Jeffers' poverty, as the trial court assessed the cost of counsel against Jeffers at the end of trial.

The defendant also urges that a prior statement that he had given to two federal agents should have been suppressed. This statement was admitted at the prior conspiracy trial over defendant's objections and we affirmed its use there. *United States v. Jeffers*, 520 F.2d 1256, 1268 (7th Cir. 1975). The trial court in the present case held a new evidentiary hearing on the question and came to the same conclusion as had the court in the previous case. We cannot on this new record find any more ground for error than on the old record. The admission of the statement was proper.

Jeffers also contends that false testimony was admitted on the issue of attorney's fees. The testimony, however, was admitted on cross-examination; it was not direct testimony, but only hearsay (as the witness admitted she had only "heard" that the Family paid $4,000,-000 in attorney's fees); and came in while the defense was trying to test the credibility of the witness by reading the witness' prior statements. If there was any prejudice from the admission of this testimony (which is doubtful), it was counsel's fault. Neither the prosecutor nor the court had anything to do with its admission.

Finally, the defendant contends that the court committed prejudicial error in not allowing the jury to see three witnesses called by the defense refuse to testify on fifth amendment grounds. The defendant suggests that "the offer of the lack of testimony of three individuals who were repeatedly named as leaders in the 'Family' was intended to show that Jeffers had done everything he could to get testimony." As helpful as it might have been for the jury to see these witnesses "take the fifth" (and it certainly is doubtful what help if any this could be), the impropriety of having the jury exposed to such suggestive non-testimony overrides any possible benefit. The trial court did not abuse its discretion in refusing to allow these witnesses before the jury.

client, the crucial question is whether such disclosure violates the substance of a confidential communication between attorney and client. The government called the defendant's former attorney for the sole purpose of establishing an element of the defendant's expenditures in the year 1973. This violated no confidential communication in the attorney-client relationship. Like any other expenditure, attorney's fees are a legitimate subject of inquiry, unless other factors are present which make an answer to such an inquiry a disclosure of a fundamental communication in the relationship. The testimony here, however, elicited no more than would have been elicited by introducing evidence that the defendant had bought a Rolls-Royce for cash (i.e., a substantial expenditure).

The case law on the question is in concurrence. The Second Circuit has noted that:

[I]n the absence of allegations as to special circumstances—we see no reason why an attorney should be any less subject to questioning about fees received from a taxpayer than should any other person who has dealt with the taxpayer. There is no further encroachment here upon any confidential relationship than there is in questioning about the existence or date of the relationship. *In re Wasserman,* 198 F.Supp. 564 (D.D.C.1961). All these matters are quite separate and apart from the substance of anything that the client may have revealed to the attorney.

*Colton v. United States,* 306 F.2d 633, 637–38 (2nd Cir. 1962). Similarly in *United States v. Pape,* 144 F.2d 778, 782 (2nd Cir.), *cert. denied* 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944), that court noted:

The authorities are substantially uniform against any privilege as applied to the fact of retainer or identity of the client. The privilege is limited to confidential communications, and *a retainer is*

*not a confidential communication,* although it cannot come into existence without some communication between the attorney and the—at that stage prospective—client. (Emphasis added.)

*Accord, In re Semel,* 411 F.2d 195 (3rd Cir. 1969), *Wirtz v. Fowler,* 372 F.2d 315, 332 (5th Cir. 1966).

Cases like *In re Grand Jury Proceedings,* 517 F.2d 666 (5th Cir. 1975), *Tillotson v. Broughner,* 350 F.2d 663 (7th Cir. 1965) and *Baird v. Koerner,* 279 F.2d 623 (9th Cir. 1960), which uphold the privilege under similar requests for information have special circumstances present which make them inapplicable to the situation here. As the Fourth Circuit explained in *NLRB v. Harvey,* 349 F.2d 900, 905 (4th Cir. 1965):

The privilege may be recognized when so much of the actual communication has already been disclosed [not necessarily by the attorney, but by independent sources as well] that identification of the client [or of fees paid] amounts to disclosure of a confidential communication.

In *Tillotson, Baird* and *In re Grand Jury Proceedings,* so much of the actual communication had already been established, that to disclose the client's name would disclose the essence of a confidential communication, because it would provide "links in an existing chain of inculpatory events or transactions." *In re Grand Jury Proceedings,* 517 F.2d at 674. No such circumstances are present here. The testimony of Jeffers' former attorney was properly admitted into evidence.

## VII

■ The defendant claims that the trial court made a number of errors with regard to the instructions given at trial. Of these, only one appears worthy of lengthy discussion.[17] This claim concerns the definitions

17. The conspiracy instructions of which the defendant complains were properly given as going to the element of a continuing series of violations and, if improper, they can only be classed as harmless error, since proof of the defendant's continuing violations was over-

whelming. Similarly, the instructions which defendant claims were contradictory, when read in proper context are neither contradictory nor are they improper. Finally, it was proper for the court to read "or" instead of "and" between "organizer, supervisor or any other

of "substantial income" in the continuing criminal enterprise provision.

The instruction given at trial read, in pertinent part, as follows:

Finally, I instruct you that the word "income" here can be simply defined as money or other material resources or property received or gained directly from illegal narcotics transactions by the defendant in question.

Incidentally, I instruct you also that *it does not necessarily mean net income. That is to say, it could mean gross receipts or gross income.*

From what I have already said, ladies and gentlemen of the jury, it would follow that the phrase "substantial income" in this kind of a charge should be construed as far as possible in an objective manner. That is to say, in order to support a conviction under this charge, you should find that Garland Jeffers received what any reasonable person would consider to be considerable or ample funds from engaging in a continuing activity of distributing heroin as an organizer or supervisor or manager. (Emphasis added.)

The defendant objects to the trial court's characterization of "income" as "not necessarily . . . net income" but possibly "gross receipts or gross income." He claims that this is inconsistent with the clear meaning of the word "income" as used in the statute and calls our attention to numerous tax cases which define income as net income.

▆ The statute provides that a person only engages in a continuing criminal enterprise when, in conjunction with meeting all the other requirements, he "obtains substantial income or resources" from the enterprise. 21 U.S.C. § 848(b)(2)(B). Nothing else in the statute provides aid in determining how "substantial income" should be characterized, whether it should be "net" or "gross." Nor does the Committee Report on the Act provide assistance. The only passage in the report which deviates from

position of management" as the statute does not require the conjunctive and, although the indictment reads "and," this does not have to

the statutory language in question speaks of "substantial profits" rather than "substantial income." H.R.Rep.No. 1444, 91st Cong., 2nd Sess. (1970) (to accompany H.R. 18583), 1970 U.S.Code Cong. & Admin.News pp. 4566, 4575.

The continuing criminal enterprise provision was intended "to serve as a strong deterrent to those who otherwise might wish to engage in the illicit [drug] traffic," *id.* at 4576, and consistent with this purpose, it cannot be construed with the strict attention to subtlety of meaning that might be proper for a tax statute. Clearly, when Congress passed the statute it intended that the continuing criminal enterprise section reach those persons who were reaping large profits from illegal drug traffic. This does not mean, however, that Congress intended "substantial income or resources" to be confined only to net income or that proof of substantial income should be confined to proof of net income. In the few cases of prosecutions for violating the continuing criminal enterprise provision, proof of "substantial income" has come in through proof of gross income or gross receipts. For instance in *United States v. Sisca,* 503 F.2d 1337, 1346 (2nd Cir. 1974), the court laid out the evidence it relied upon in this fashion:

[The defendant] admitted that he had purchased [on the morning of his arrest] heroin worth more than $170,000, and that he had been making large purchases and subsequent redistributions on a biweekly basis for a period of some two and one half years.

On the strength of this evidence, the court concluded:

[The defendant] nevertheless contends that the government failed to prove that he had gained substantial economic benefit from his distribution activities. He says that his December 15 purchase was on "consignment" and that he was $170,-000 in debt at the time. This contention is fatuous, to put it charitably. In the first place, we reject any notion that a

be followed in the instructions. *Price v. United States,* 150 F.2d 283, 285 (5th Cir. 1945).

consignment debt necessarily suggests an operational deficit. On the contrary, in the context of this record, it indicates a substantial anticipated profit. Secondly, in view of his position in the distribution network, the enormous quantity of narcotics involved (over 200 kilograms annually) and the substantial sums of money changing hands ($5,000,000 annually), the jury surely was justified in finding that [the defendant] derived substantial income from this immensely profitable narcotics enterprise.

The proof there consisted solely of gross receipts. In *United States v. Manfredi*, 488 F.2d 588 (2nd Cir. 1973), similar proof was used to support the substantial income element.[18] In *Manfredi*, also, the court suggested that the statute was aimed at those who trafficked in heroin where "substantial sums of money chang[ed] hands." *Id.* at 603.

The courts have not taken the "substantial income" requirement as setting some definite amount of profits that must be proven to obtain a conviction for engaging in a continuing criminal enterprise. Nor do we think this would be a proper interpretation of the statute. The "substantial income" requirement should be interpreted as a guide to the magnitude of the criminal enterprise. Congress did not seek to punish small-time operators under this section. It sought to punish only those who obtained "substantial income or resources" from a continuing series of drug violations. Certainly, this can be established by substantial gross receipts or substantial gross income as in *Sisca* and *Manfredi*. Examined in this light, and keeping in mind the extreme difficulty in this conspiratorial, criminal area of finding hard evidence of net profits, the definition

of income as "gross income or gross receipts" was entirely proper.

## VIII

Finally, the defendant contends that the evidence on the issue of substantial income was not sufficient to sustain his conviction. On the question of substantial income, the government produced voluminous evidence. We need only refer to four witnesses.

Isaac Davis testified that Jeffers considered the money made from Family operations as his money. He also testified that for almost half of 1973 he turned over five thousand dollars a day to Jeffers. James Poole testified that from August 1972 through December 1972, similar amounts were turned over to Jeffers. The testimony of Willie J. Williams and Ollie Mae Vinson further supported the fact that huge sums were coming into Jeffers' possession weekly. If, as we noted earlier, we make an extremely conservative estimate that Jeffers netted ten thousand dollars per week, we find that he made over one million dollars during the duration of the indictment. Certainly, this satisfies the substantial income requirement.

The judgment of conviction is affirmed.

AFFIRMED.

---

**18.** The court wrote:

[The defendant] was selling heroin and cocaine in a continuing series of weekly transactions . . . .. To Horace Marble alone he sold an estimated one million dollars' worth in 17 months.

*Id.* at 596. Also, the court in *Manfredi* noted—

Here, . . . the statute might have been more artfully drawn, but no language has occurred or has been suggested to us that

better expresses the congressional purpose. To sustain appellant[s] position [that the statute is unconstitutionally vague] would force us to hold that words cannot be devised to make it an offense to engage in the continuous sale and trafficking in heroin with a number of other people and with substantial sums of money changing hands.

*Id.* at 603.